## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Ward Brehm,** in his personal capacity
and in his official capacity as President
of the United States African
Development Foundation, 1400 I Street
NW Washington, DC 20005

            Plaintiff,

**v.**

**Pete Marocco**, in his official capacity
as Acting Deputy Administrator for
Policy and Planning and for
Management and Resources for USAID
and Director of Foreign Assistance at
the Department of State and in his
purported official capacity as Chairman
of the Board of the United States
African Development Foundation, 1300
Pennsylvania Ave. NW Washington, DC
20004,

**Sergio Gor,** in his official capacity as
Director of the White House Presidential
Personnel Office, 1600 Pennsylvania
Avenue NW Washington, DC 20500,

**U.S. DOGE Service,** 736 Jackson
Place, N.W. Washington, D.C. 20503,

**U.S. DOGE Service Temporary
Organization,** 736 Jackson Place, N.W.
Washington, D.C. 20503,

**Amy Gleason,** in her official capacity as
the Acting Administrator of U.S. DOGE
Service and U.S. DOGE Service
Temporary Organization, 736 Jackson
Place, N.W. Washington, D.C. 20503,

**Civil Case No.**

**Complaint for declaratory and
injunctive relief**

**Stephen Ehikian,** in his official capacity as Acting Administrator of the U.S. General Services Administration, 1800 F Street NW Washington, DC 20405, and

**Donald J. Trump,** in his official capacity as President of the United States of America, 1600 Pennsylvania Avenue NW Washington, DC 20500,

Defendants**.**

## INTRODUCTION

1.      Plaintiff Ward Brehm is the President and CEO of the United States African Development Foundation, a congressionally created agency. He was duly appointed by the Board of Directors, as authorized by statute.

2.      Despite the clear statutory requirement that USADF "shall have perpetual succession unless dissolved by an Act of Congress," 22 U.S.C. § 290h-4(a)(1), Defendants are dead-set on shuttering the agency.

3.      On February 21, President Trump issued an Executive Order describing USADF as "unnecessary." Within days, Defendants launched a full-on assault against USADF. First, DOGE gained access to the agency under the false pretenses of modernizing and streamlining USADF's computer systems. When USADF learned that DOGE was there to kill the agency, USADF staff refused DOGE access to cancel all grants and contracts. DOGE employees began threatening members of the Board—telling them that unless they carried out DOGE's plans to strip USADF to its

core, the Board would be fired. When that didn't work, USADF was told that President Trump did not need to follow the required process for advice and consent of the Senate and instead had appointed Pete Marocco as the sole board member (despite there still being four properly appointed board members, none of whom had received any notification of termination).

4.    Yesterday, Wednesday, March 5, DOGE staff and Marocco attempted to access USADF's offices. Plaintiff Brehm had told them that he was President of USADF and that he had instructed staff to not allow Defendants access as they had no legal authority. Undeterred, Marocco and DOGE threatened a security guard with a lawsuit and told the building's property manager that they would bring in U.S. Marshals and the Secret Service unless they were given access to USADF. Their threats were unsuccessful.

5.    Defendants have made clear their intentions: ignore statutory requirements, pretend that leadership of the agency does not exist, and shutter USADF. That is precisely what they did to USADF's sister agency, the Inter-American Foundation (IAF). Using the same bullying tactics, they attempted to get access to IAF's grants and contracts. When that failed, they purported to fire IAF's President and then announced by fiat that Marocco had been appointed sole board member (despite the IAF board also not having been fired). In a closed-door board meeting last Friday, February 28—which consisted of just Marocco in the IAF lobby— Marocco appointed himself acting President of IAF. That night, at Marocco's direction, Treasury cancelled all but a handful of IAF's contracts. And two days ago,

purporting to act as both President and sole board member, Marocco directed DOGE to cancel all but a few of IAF's grants, shut employees out of the IT systems, laid off almost the entire IAF staff, and shut down IAF's website.

6.     Without this Court's immediate intervention, Defendants will continue their tactics and strongarm their way into USADF, no matter that USADF has a legally constituted Board and President. And within days, the damage that they do will be irreparable. The Court should declare these actions ultra vires and preliminarily and permanently enjoin Defendants from outright ignoring the law in their attempts to remove Plaintiff Brehm and shut down USADF.

## JURISDICTION AND VENUE

7.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiff alleges violations of the United States Constitution, the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, the African Development Foundation Act, 22 U.S.C. § 290h-1 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

8.     Venue is proper under 28 U.S.C. § 1391(e)(1), because all defendants reside in this district, and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

9.     This Court has the authority to grant the relief requested by Plaintiff under Rules 57 and 65 of the Federal Rules of Civil Procedure, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 *et seq.*, under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, under the Mandamus Act, 28 U.S.C. § 1361, and under the Court's inherent equitable authority.

## PARTIES

10.     Plaintiff Ward Brehm has been appointed by the Board of the United States African Development Foundation (USADF) to serve as the President of USADF, and he continues to serve lawfully in that role. Plaintiff Brehm sues in his individual and official capacities.

11.     Defendant Pete Marocco is the Acting Deputy Administrator for Policy and Planning and for Management and Resources for USAID and Director of Foreign Assistance at the Department of State. He also purports to be the Chair of the Board of USADF, but his purported appointment to that position was *ultra vires*.

12.     Defendant Sergio Gor is the Director of the White House Presidential Personnel Office.

13.     Defendant U.S. DOGE Service is an entity that was created within the Executive Office of the President by Executive Order 14158.

14.     Defendant U.S. DOGE Service Temporary Organization is an entity that was created within the Executive Office of the President by Executive Order 14158.

15.     Defendant Amy Gleason is the Acting Administrator of U.S. DOGE Service and U.S. DOGE Service Temporary Organization.

16.     Defendant Scott Bessent is the Secretary of the Treasury.

17.     Defendant Donald J. Trump is the President of the United States.

## LEGAL BACKGROUND

### The Appointments Clause

18.    The Appointments Clause of the United States Constitution provides that: "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const., art. II, § 2, cl. 2.

19.    "Only the President, with the advice and consent of the Senate, can appoint . . . 'principal' officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021).

20.    But "the Appointments Clause permits Congress to dispense with joint appointment . . . for inferior officers. Congress may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 12-13 (internal citation omitted).

### African Development Foundation Act

21.    Congress established the United States African Development Foundation as a "body corporate," 22 U.S.C. § 290h-1(a), to fulfill the statutory purposes "to enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives"; "to strengthen the bonds of friendship and understanding between the people of Africa and the United States";

"to support self-help activities at the local level designed to enlarge opportunities for community development"; "to stimulate and assist effective and expanding participation of Africans in their development process"; and "to encourage the establishment and growth of development institutions which are indigenous to particular countries in Africa and which can respond to the requirements of the poor in those countries." 22 U.S.C. § 290h-2(a).

22.     Congress instructed USADF to carry out these purposes "in cooperation with, and in response to, organizations indigenous to Africa which are representative of the needs and aspirations of the poor in Africa," and directed that USADF shall "to the extent possible, coordinate its development assistance activities with the activities of the United States Government and private, regional, and international organizations." 22 U.S.C. § 290h-2(b).

23.     To fulfill these statutory purposes, Congress authorized USADF to "make grants, loans, and loan guarantees" —not to exceed $250,000 for any particular project—"to any African private or public group (including public international organizations), association, or other entity engaged in peaceful activities" including "the fostering of local development institutions," "the development of self-evaluation techniques by participants in projects supported" by USADF, "development research by Africans and the transfer of development resources," and "the procurement of such technical or other assistance as is deemed appropriate by the recipient of such grant, loan, or guarantee." 22 U.S.C. § 290h-3(a).

24.     In making grants, loans, and loan guarantees under subsection (a) of this section, Congress directed that "the Foundation shall give priority to projects which community groups undertake to foster their own development and in the initiation, design, implementation, and evaluation of which there is the maximum feasible participation of the poor." 22 U.S.C. § 290h-3(b).

25.     Congress specified that USADF, "as a corporation," "shall have perpetual succession unless dissolved by an Act of Congress." 22 U.S.C. § 290h-4(a)(1).

26.     Congress empowered USADF to "prescribe, amend, and repeal such rules and regulations as may be necessary for carrying out the functions of the Foundation"; to "make and perform such contracts and other agreements with any individual, corporation, or other private or public entity however designated and wherever situated, as may be necessary for carrying out the functions of the Foundation"; and to "determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid[.]" 22 U.S.C. § 290h-4(a).

27.     The management of USADF is vested in a board of directors, composed of seven members appointed by the President, by and with the advice and consent of the Senate. 22 U.S.C. § 290h-5(a). All members of the Board shall be appointed "on the basis of their understanding of and sensitivity to community level development processes." *Id.* Members of the Board shall be appointed so that no more than four members of the Board are members of any one political party. *Id.*

28.    The Board of USADF manages the entity through the appointment of a President and an Advisory Council. 22 U.S.C. § 290h-5(d), (e).

29.    Congress has appropriated to USADF, "[f]or necessary expenses to carry out the African Development Foundation Act," $45 million to remain available until September 30, 2025. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024).

30.    Congress prohibited USADF from using any appropriated funds to "implement a reorganization, redesign, or other plan," that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations" or "expand, eliminate, consolidate, or downsize the United States official presence overseas," without first consulting with the Appropriations Committees of both houses and providing a detailed justification for any such plan. *Id.*, § 7063(a), (b), 138 Stat. at 843-44.

## FACTUAL ALLEGATIONS

### USADF's structure and work

31.    USADF was "established by Congress to invest directly in African grassroots enterprises and social entrepreneurs." United States African Development Foundation, www.usadf.gov (last accessed Mar. 5, 2025). USADF provides grant funds, among other resources, "to develop, grow and scale African enterprises and entrepreneurs who improve lives and livelihoods." *Id.* "USADF's investments increase incomes, revenues, and jobs by promoting self-reliance and market-based solutions to poverty." *Id.* USADF works with partners in 22 African countries,

focusing on "populations least served by existing markets or assistance programs" with the goal of helping them "transition out of poverty." *Id.*

*32.*    In fiscal year 2024, USADF made significant investments to drive growth in key sectors, including $16.56 million across 114 grants enhancing agriculture, $7.37 million across 34 grants expanding off-grid energy access, and $4.19 million across 94 grants advancing youth and women entrepreneurship. *Id.*

### February 19 Executive Order

33.    On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy."[1]

34.    The purpose of the executive order is to "reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary."

35.    The executive order list federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law."

36.    The executive order lists USADF as one of the targeted entities.

37.    Under the executive order, "the head of each unnecessary governmental entity" has 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the

---

[1] Exec. Order No. 14217, 90 Fed. Reg. 10577 (Feb. 19, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/commencing-the-reduction-of-the-federal-bureaucracy/.

governmental entity, or any components or functions thereof, are statutorily required and to what extent."

38.    In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

39.    The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations."

### DOGE's attempts to shut down USADF

40.    On February 20, 2025, the day after the executive order was issued, Chris Young, a representative of the U.S. DOGE Service, met with members of the USADF leadership team. At the meeting, Young described the intent of the U.S. DOGE Service that two engineers from the General Services Administration (GSA) would be detailed to USADF to provide software expertise to modernize architecture, system design, and improve government efficiency. That evening, Young submitted two memoranda of understanding (MOUs) for a detail assignment between GSA and USADF for Ethan Shaotran and Nate Cavanaugh which similarly described the scope

of these individuals' details. The effective period of both detail assignments was to be from February 20, 2025, through July 4, 2026.

41.     The next day, February 21, 2025, Shaotran and Cavanaugh, accompanied by Jake Altik, a lawyer from the U.S. DOGE Service, arrived at USADF and met with USADF's leadership team. During this meeting the parties signed the MOUs that had been provided the night before. The U.S. DOGE Service team then proceeded to describe their purpose for arriving at USADF, which was to reduce the functions of the Foundation to the "minimum presence and function" required under their reading of the African Development Foundation Act, which in their view required only that the Foundation retain its Board and President and that the agency maintain only one or two grants funded by private sector partnerships. In their view, all other personnel of the agency would be eliminated to fulfill the executive order.

42.     The U.S. DOGE Service representatives demanded immediate access to USADF systems including financial records, payment and human resources systems to include staff job descriptions, personnel files, salaries, and organizational structure. The USADF management team responded by requesting an assessment of the legal basis for Altik's interpretation of USADF statutory function. USADF management further outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from the Agency's systems. USADF management further explained that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act.

43.    The U.S. DOGE Service representatives responded by noting that they would seek waivers to avoid the clearance process from the USADF Board. Altik stated that if the Board was unable to provide immediate clearance, they would issue a notice of dismissal to all members of the Board. The U.S. DOGE Service representatives asked for contact information for each of the members of the Board. UADF management responded that this contact information was personal and that therefore she would first need to obtain permission from the Board members to share it. The U.S. DOGE Service representatives then left the meeting and never followed up to request contact information for the Board.

44.    On Saturday, February 22, 2025, U.S. DOGE Service representatives did reach one member of the Board, John Agwunobi. They stated to Agwunobi, incorrectly, that all the other members of the Board had been terminated, and asked Agwunobi to implement the U.S. DOGE Service's vision of the minimum statutory functions of USADF. Agwunobi declined to cooperate with the attempt to dismantle the agency.

45.    On Monday, February 24, 2025, Ward Brehm, then a member of the Board of USADF, received a notice from the Presidential Personnel Office that he had been terminated from his position on the Board. No other Board member has received any similar notice.

46.    In the afternoon of February 28, 2025, USADF management received a letter from the Presidential Personnel Office purporting to appoint Pete Marocco as the Acting Chair of the Board of USADF. No provision of law authorizes the

appointment of a person to the Board of USADF on an acting basis, or on any basis other than Presidential nomination and Senate confirmation.

47.    On the morning of March 3, 2025, the Board of USADF held an emergency meeting and determined that the purported appointment of Marocco was illegal. The Board adopted a resolution appointing Brehm as the President of USADF. On the same day, the Board transmitted a memorandum to members of Congress, alerting them to the illegal attempt to appoint Marocco to the Board, and informing Congress that Brehm was now the President of USADF.

48.    On March 4, 2025, the Board held its regularly scheduled quarterly meeting. *See* United States African Development Foundation: Notice of Meeting, 90 Fed. Reg. 11037, 11037 (Mar. 3, 2025). Marocco did not attempt to attend this meeting.

49.    On the afternoon of March 4, 2025, the U.S. DOGE Service representative, Cavanaugh, emailed USADF management to state that Marocco would arrive the next day at the offices of USADF's headquarters with software engineers who had purportedly been detailed to the Foundation.

50.    On the morning of March 5, 2025, Brehm, in his capacity as President of USADF, responded that Marocco did not legally hold any position with the Foundation, and that accordingly he had instructed USADF not to permit Marocco or any other persons from outside the agency to gain access to USADF's offices. Marocco and several representatives from U.S. DOGE Service arrived at USADF's offices around mid-day on March 5, but were denied access to those offices. Marocco and his

colleagues threatened to return to the offices with United States Marshals and Secret Service.

51.     If Marocco is permitted to exercise authority on behalf of USADF, he intends to terminate Brehm from his position as President of USADF.

### DOGE shuts down IAF

52.     The U.S. DOGE Service has pursued a virtually identical plan to terminate USADF's sister agency, the Inter-American Foundation (IAF). On February 20, 2025, the same day that U.S. DOGE Service representatives Shaotran and Cavanaugh initially met with USADF, they also met with representatives of IAF. As they did with USADF, the DOGE representatives told IAF that they were there to help improve IAF's software and systems. After the MOUs were signed, they then informed IAF that their real goal was to reduce the functions of IAF to what they characterized as its statutory minimum operations and requested access to IAF's systems to help them to accomplish that goal.

53.     On February 21, 2025, representatives of IAF met again with Cavanaugh and Shaotran and an additional representative of the U.S. DOGE Service, Jacob Altik. Altik stated his view that the minimum statutory requirements for IAF would be the existence of a Board and a President, a presence in the District of Columbia, and a "minimum level" of grants and contracts. DOGE accordingly intended to effectuate the reduction-in-force (RIF) of most, if not all IAF's employees, and the termination of all but a handful of IAF's grants and contracts. The DOGE representatives stated that it was their intent that RIF notices would be sent out that

day if the Board supported that action. The DOGE representatives suggested that if the Board did not agree with that plan, DOGE's intent would be to terminate the Board.

54.    The DOGE representatives were told that it would be difficult to convene the Board immediately and that the Board was subject to certain legal requirements before convening. The DOGE representatives stated that they were not concerned with these legal requirements and that they needed an immediate yes-or-no answer from the Board.

55.    The DOGE representatives were also told that IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 (2024), from initiating any reduction in IAF's functions without first providing notice to Congressional appropriations committees.

56.    On February 24, 2025, the DOGE representative, Altik, contacted one of the members of the Board of IAF asking if that Board member would align with DOGE's vision. That Board member declined to provide Board that assurance, because he believed that DOGE's plans for the agency were unlawful.

57.    On the evening of Friday, February 28, 2025, representatives of IAF received a communication that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of IAF. The communication represented that there were no other remaining members of the Board of IAF. But the remaining members of the Board of IAF still held (and still hold) their positions.

The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had an inherent authority to do so.

58.    That same evening, Marocco held an "emergency board meeting" outside the IAF office because no one was there to let him in. Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member. He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of IAF.

59.    Marocco, now representing himself to be the President of IAF, instructed the Bureau of the Fiscal Service of the U.S. Department of the Treasury to terminate all but a handful of IAF's contracts.

60.    On Monday, March 3, 2025, Marocco and DOGE implemented a RIF of most or all IAF's employees. Marocco and DOGE began the process of cancelling almost all IAF grants and returning outside donations. They shut all employees out of the IT systems. And they had the IAF website taken down.

**DOGE**

61.     DOGE Defendants' rapid and unlawful overreach against USADF is of a piece with their actions at several other federal agencies over the past month.

62.    On January 20, 2025, hours after his inauguration, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," reorganizing and renaming the United

States Digital Service as the United States DOGE Service, established in the Executive Office of the President.

63.    The Executive Order established the role of U.S. DOGE Service Administrator within the Executive Office of the President, reporting to the White House Chief of Staff.

64.    The Executive Order further established a temporary organization within the U.S. DOGE Service, "the U.S. DOGE Service Temporary Organization." The U.S DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing the "President's 18-month DOGE agenda."

65.    Executive Order 14158 does not—and could not—vest any statutory authority in any of the DOGE Defendants.

66.    Congress has neither established, nor appropriated money for, any of the DOGE Defendants. They appear to be operating at the direction of the President and at the direction of Elon Musk, who, on information and belief, either is the Acting United States DOGE Service Administrator, or is otherwise exercising substantial authority within the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization.

67.    DOGE has entered numerous federal agencies since Inauguration Day, repeating their behavior at virtually every stop: swooping in with DOGE staff, demanding access to sensitive information systems, and threatening or taking employment action against employees who resist unlawful commands.

68.     DOGE also frequently attempts to re-work entire agencies to DOGE's will.

69.     Since Inauguration Day, DOGE personnel have sought, and in most instances, obtained, unprecedented access to information systems across numerous federal agencies, including: the United States Agency for International Development, the Department of Treasury (including the Internal Revenue Service), the Department of Labor, the Department of Health and Human Services, the Consumer Financial Protection Bureau, the National Oceanic and Atmospheric Administration, the Office of Personnel Management, the General Services Administration, the Social Security Administration, and the Department of Education.

70.     In many instances, DOGE access to agency systems is initially eased by the presence of new political leadership who do not resist DOGE's unlawful access demands.

## CLAIMS FOR RELIEF

## COUNT I

### Ultra vires—violation of statutory and Constitutional authority

71.     Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

72.     Brehm has a clear entitlement to remain in his office as the President of USADF. The African Development Foundation Act sets out in no uncertain terms that the Board appoints the President of USADF on such terms as the Board may

determine. 22 U.S.C. § 290h-5(d)(1). The Board alone retains the power to remove him from that office. The Board has not done so.

73.    Marocco's purported appointment as acting Chair of the Board of USADF is *ultra vires*. The African Development Foundation Act requires that the Board be appointed "by and with the advice and consent of the Senate." 22 U.S.C. § 290h-5(a)(1). Marocco has not been nominated by the President or confirmed by the Senate to a seat on the Board of USADF. No provision of law authorizes the President to appoint an acting member of the Board of USADF.

74.    The threatened termination of Brehm from his position as President of USADF, whether by Marocco, President Trump, Director Gao, or any of the remaining Defendants, is unlawful. None of the Defendants is lawfully a member of the Board of USADF, and only the Board has the authority to remove Brehm from his position.

75.    As a result, the purported termination of Brehm and the purported appointment of Marocco are *ultra vires* and are clear violations of USADF's organic statute.

## COUNT II

### Ultra vires—violation of the separation of powers

76.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

77.    The threatened removal of Brehm is further invalid because it violates Article II, section 2 of the U.S. Constitution. The Appointments Clause grants

Congress the authority to vest the appointment of inferior officers, such as the President of USADF, in the heads of Departments. Congress has exercised that authority to grant the Board of USADF the exclusive authority to appoint the President of USADF, and the Board of USADF accordingly holds the exclusive authority to remove that officer. Moreover, the Appointments Clause requires the appointment of principal officers, such as the Board of USADF, through the process of Presidential nomination and Senate confirmation. Although Congress has authorized limited departures from that process for certain acting officials, it has not authorized the appointment of acting members of the Board of USADF. The purported termination of Brehm and the purported appointment of Marocco are in violation of the authorities vested in Congress by the Constitution and further violates the President's duty under article II to "take Care that the Laws be faithfully executed."

78.    The African Development Foundation Act requires that the Board be appointed "by and with the advice and consent of the Senate." 22 U.S.C. § 290h-5(a)(1).

*79.*    The African Development Foundation Act does not provide any process for filling vacancies with acting board members. 22 U.S.C. § 290h-5(a)(1). Instead, "upon the expiration of his term of office a member shall continue to serve until his successor is appointed and shall have qualified." 22 U.S.C. § 290h-5(a)(2).

80.    Under the Federal Vacancies Reform Act of 1998, 5 U.S.C. § 3341 *et seq.*, the President can appoint acting heads of agencies in specific, outlined instances. 5 U.S.C. § 3345.

81.    But the President's ability to fill vacancies does not apply to "any member who is appointed by the President, by and with the advice and consent of the Senate to any board, commission, or similar entity that—(A) is composed of multiple members; and (B) governs an independent establishment or Government corporation." 5 U.S.C. § 3349(c).

82.    "Insofar as Congress has made explicit statutory requirements, they must be observed." *Angelus Milling Co. v. Comm'r*, 325 U.S. 293, 296 (1945).

### COUNT III

**Violation of the Administrative Procedure Act—706(2)(C)**
**In excess of statutory jurisdiction, authority, or limitations**
**Against defendant agencies**

83.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

84.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), or that is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C).

85.    To the extent that Defendants purport to exercise authority with respect to USADF without regard to Brehm's position as President of USADF, or through Marocco's invalid appointment as Chair of the Board of USADF, those actions are

22

"not in accordance with the law," "contrary to a constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Brehm seeks to hold unlawful and set aside such actions, pursuant to the Administrative Procedure Act and to compel agency action unlawfully withheld or unreasonably delayed.

## COUNT IV

## Declaratory Judgment Act, 28 U.S.C. § § 2201 and 2202

86.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

87.    Brehm is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Brehm and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Brehm lawfully remains the President of USADF and that Marocco has not been lawfully appointed to any position within USADF.

## COUNT V

## Writ of Mandamus

88.    Plaintiff restates and realleges all paragraphs above as if fully set forth here.

89.    In the alternative, Brehm is entitled to a writ of mandamus. The African Development Foundation Act imposes a ministerial duty on the President and subordinate officials not to interfere with Brehm's office as President of USADF until

such time as the Board of USADF removes him from that position, and it imposes a ministerial duty on these officials not to purport to appoint an acting member of the Board of USADF. Brehm is clearly entitled to a writ of mandamus prohibiting his removal from office by any person or entity other than the Board of USADF and prohibiting Marocco from exercising any authorities purportedly on behalf of USADF and, absent this Court granting one of the counts identified above, there is no other adequate means of redress.

## COUNT VI

### Equitable Relief for Statutory and Constitutional Violations

90.    The preceding paragraphs are incorporated and realleged here.

91.    Under this Court's traditional equitable jurisdiction, Plaintiff is entitled to equitable relief to prevent and restrain ongoing violations of both statutory and constitutional federal law by the defendants. Equitable actions have "long been recognized as the proper means" to prevent public officials from acting unconstitutionally. Because such actions seek simply to halt or prevent a violation of federal law rather than the award of money damages, they do not ask the Court to imply a new cause of action. To the contrary, the ability to sue to enjoin unlawful and unconstitutional actions by federal officers is the creation of courts of equity and reflects a long history of judicial review of illegal executive action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

### PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

a.   Enter a preliminary and permanent injunction ordering that Plaintiff Ward Brehm may not be removed from his office as President of the United States African Development Foundation, or in any way be treated as having been removed, denied or obstructed in accessing any of the benefits or resources of his office, or otherwise be obstructed from his ability to carry out his duties, absent a decision by the Board of the United States African Development Foundation to remove him from that office;

b.   Enter a preliminary and permanent injunction ordering that Defendants may not appoint Pete Marocco or any other person as an acting member of the Board of the United States African Development Foundation, that Defendants may not place Pete Marocco or any other person as President of the United States African Development Foundation in Plaintiff Ward Brehm's position, or otherwise recognize any other person as President of the United States African Development Foundation, and that any actions taken or contemplated to be taken by Pete Marocco or any other improperly appointed person as an officer of the United States African Development Foundation are void *ab initio* and without effect;

c.   Declare that Plaintiff Ward Brehm lawfully remains the President of the United States African Development Foundation and that Defendant Pete Marocco has not been lawfully appointed as an acting member of

the Board of the United States African Development Foundation, as the

President of the United States African Development Foundation, or as

any other officer of the United States African Development Foundation;

d.    Award Plaintiff costs of suit and attorneys' fees and expenses pursuant

to any applicable law; and

e.    Issue such other relief as the Court deems proper.

March 6, 2025                                  Respectfully submitted,

 

    */s/ Bradley Girard*
Bradley Girard (DC Bar No. 1033743)
Joel McElvain (DC Bar No. 448431)*
Robin F. Thurston (DC Bar No. 1531399)
Skye Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
bgirard@democracyforward.org
jmcelvain@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*motion to appear pro hac vice forthcoming

*Counsel for Plaintiffs*

26