### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ward Brehm**, | |
| Plaintiff, | |
| **v.** | Civil Case No. **25-cv-660** |
| **Pete Marocco,** *et al.*, | |
| Defendants. | |

### MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
### TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Factual Background .................................................................................................... 2

Argument .................................................................................................................... 15

   **I.**   Plaintiff is likely to succeed on the merits. ....................................... 16

      A.   Brehm is, at most, an inferior officer and not subject to removal by any entity other than the Board of USADF. ............................................... 16

      B.   Marocco does not lawfully hold a position as a Board Member or Officer of the United States African Development Foundation. ........................................ 19

   **II.**  Plaintiff will suffer irreparable harm unless the government's action is enjoined. ................................................................................................................. 24

   **III.** The balance of equities and public interest favor Plaintiff. ............................. 26

Conclusion .................................................................................................................. 28

**INTRODUCTION**

Plaintiff Ward Brehm is the President and CEO of the United States African Development Foundation, a congressionally created agency. He was duly appointed by the Board of Directors, as authorized by statute. Despite the clear statutory requirement that USADF "shall have perpetual succession unless dissolved by an Act of Congress," 22 U.S.C. § 290h-4(a)(1), Defendants are dead-set on shuttering the agency.

On February 21, President Trump issued an Executive Order describing USADF as "unnecessary." Within days, Defendants launched a full-on assault against USADF. First, DOGE gained access to the agency under the false pretenses of modernizing and streamlining USADF's computer systems. When USADF learned that DOGE was there to kill the agency, USADF staff refused DOGE access to cancel all grants and contracts. DOGE employees began threatening members of the Board—telling them that unless they carried out DOGE's plans to strip USADF to its core, the Board would be fired. When that didn't work, USADF was told that President Trump did not need to follow the required process for advice and consent of the Senate and instead had appointed Pete Marocco as the sole board member (despite there still being four properly appointed board members, none of whom had received any notification of termination).

Yesterday, Wednesday, March 5, DOGE staff and Marocco attempted to access USADF's offices. Plaintiff Brehm had told them that he was President of USADF and that he had instructed staff to not allow Defendants access as they had no legal

authority. Undeterred, Marocco and DOGE threatened a security guard with a lawsuit and told the building's property manager that they would bring in U.S. Marshals and the Secret Service unless they were given access to USADF. Their threats were unsuccessful.

This morning, however, Marocco and DOGE showed up with U.S. Marshals and forced their way into USADF. Marocco has purported to appoint himself President of USADF. And at the very moment that this motion is being finalized, Marocco and DOGE are demanding—based on Marocco's illusory authority—immediate access to USADF's computer systems. Access to the USADF computer systems would not only give DOGE troves of sensitive data, it would also allow Defendants to inflict irreparable harm on USADF and all its employees, including Plaintiff Brehm. This Court should issue emergency relief immediately.

## FACTUAL BACKGROUND

### The United States African Development Foundation

Congress established the United States African Development Foundation as a "body corporate," 22 U.S.C. § 290h-1(a), to fulfill the statutory purposes "to enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives"; "to strengthen the bonds of friendship and understanding between the people of Africa and the United States"; "to support self-help activities at the local level designed to enlarge opportunities for community development"; "to stimulate and assist effective and expanding participation of Africans in their development process"; and "to encourage the establishment and growth of development institutions which are indigenous to particular countries in

Africa and which can respond to the requirements of the poor in those countries." 22 U.S.C. § 290h-2(a).

Congress instructed USADF to carry out these purposes "in cooperation with, and in response to, organizations indigenous to Africa which are representative of the needs and aspirations of the poor in Africa," and directed that USADF shall "to the extent possible, coordinate its development assistance activities with the activities of the United States Government and private, regional, and international organizations." 22 U.S.C. § 290h-2(b).

To fulfill these statutory purposes, Congress authorized USADF to "make grants, loans, and loan guarantees" —not to exceed $250,000 for any particular project—"to any African private or public group (including public international organizations), association, or other entity engaged in peaceful activities" including "the fostering of local development institutions," "the development of self-evaluation techniques by participants in projects supported" by USADF, "development research by Africans and the transfer of development resources," and "the procurement of such technical or other assistance as is deemed appropriate by the recipient of such grant, loan, or guarantee." 22 U.S.C. § 290h-3(a).

In making grants, loans, and loan guarantees under subsection (a) of this section, Congress directed that "the Foundation shall give priority to projects which community groups undertake to foster their own development and in the initiation, design, implementation, and evaluation of which there is the maximum feasible participation of the poor." 22 U.S.C. § 290h-3(b).

3

Congress specified that USADF, "as a corporation," "shall have perpetual succession unless dissolved by an Act of Congress." 22 U.S.C. § 290h-4(a)(1). Congress empowered USADF to "prescribe, amend, and repeal such rules and regulations as may be necessary for carrying out the functions of the Foundation"; to "make and perform such contracts and other agreements with any individual, corporation, or other private or public entity however designated and wherever situated, as may be necessary for carrying out the functions of the Foundation"; and to "determine and prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid[.]" 22 U.S.C. § 290h-4(a).

The management of USADF is vested in a board of directors, composed of seven members appointed by the President, by and with the advice and consent of the Senate. 22 U.S.C. § 290h-5(a). All members of the Board shall be appointed "on the basis of their understanding of and sensitivity to community level development processes." *Id*. Members of the Board shall be appointed so that no more than four members of the Board are members of any one political party. *Id*.

The Board of USADF manages the entity through the appointment of a President, who exercises authority on such terms as the Board shall determine, and an Advisory Council. 22 U.S.C. § 290h-5(d), (e).

Congress has appropriated to USADF, "[f]or necessary expenses to carry out the African Development Foundation Act," $45 million to remain available until September 30, 2025. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). Congress prohibited USADF from using

any appropriated funds to "implement a reorganization, redesign, or other plan," that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations" or "expand, eliminate, consolidate, or downsize the United States official presence overseas," without first consulting with the Appropriations Committees of both houses and providing a detailed justification for any such plan. *Id.*, § 7063(a), (b), 138 Stat. at 843-44.

USADF was "established by Congress to invest directly in African grassroots enterprises and social entrepreneurs." United States African Development Foundation, www.usadf.gov (last accessed Mar. 5, 2025); Ex. A, Brehm Decl., ¶ 2. USADF provides grant funds, among other resources, "to develop, grow and scale African enterprises and entrepreneurs who improve lives and livelihoods." *Id.* "USADF's investments increase incomes, revenues, and jobs by promoting self-reliance and market-based solutions to poverty." *Id.* USADF works with partners in 22 African countries, focusing on "populations least served by existing markets or assistance programs" with the goal of helping them "transition out of poverty." *Id.*

In fiscal year 2024, USADF made significant investments to drive growth in key sectors, including $16.56 million across 114 grants enhancing agriculture, $7.37 million across 34 grants expanding off-grid energy access, and $4.19 million across 94 grants advancing youth and women entrepreneurship. *Id.*; Ex. A, Brehm Decl., ¶ 2.

**February 19 Executive Order**

5

On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy." The purpose of the executive order is to "reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary."

The executive order list federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and function required by law." The executive order lists USADF as one of the targeted entities.

Under the executive order, "the head of each unnecessary governmental entity" has 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent."

In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order."

The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or

the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations."

**DOGE's attempts to shut down USADF**

On February 20, 2025, the day after the executive order was issued, Chris Young, a representative of the U.S. DOGE Service, met with members of the USADF leadership team. Ex. B, Feleke Decl., ¶ 3; Ex. C, Leslie Decl., ¶ 7. At the meeting, Young described the intent of the U.S. DOGE Service that two engineers from the General Services Administration (GSA) would be detailed to USADF to provide software expertise to modernize architecture, system design, and improve government efficiency. Ex. B, Feleke Decl., ¶ 3. That evening, Young submitted two memoranda of understanding (MOUs) for a detail assignment between GSA and USADF for Ethan Shaotran and Nate Cavanaugh which similarly described the scope of these individuals' details. Ex. B, Feleke Decl., ¶¶ 3-5. The effective period of both detail assignments was to be from February 20, 2025, through July 4, 2026. *Id.*

The next day, February 21, 2025, Shaotran and Cavanaugh, accompanied by Jake Altik, a lawyer from the U.S. DOGE Service, arrived at USADF and met with USADF's leadership team. During this meeting the parties signed the MOUs that had been provided the night before. Ex. B, Feleke Decl., ¶ 4. The U.S. DOGE Service team then proceeded to describe their purpose for arriving at USADF, which was to reduce the functions of the Foundation to the "minimum presence and function" required under their reading of the African Development Foundation Act, which in their view required only that the Foundation retain its Board and President and that

the agency maintain only one or two grants funded by private sector partnerships. Ex. B, Feleke Decl., ¶ 5. In their view, all other personnel of the agency would be eliminated to fulfill the executive order. *Id.*

The U.S. DOGE Service representatives demanded immediate access to USADF systems including financial records, payment and human resources systems to include staff job descriptions, personnel files, salaries, and organizational structure. Ex. B, Feleke Decl., ¶7. The USADF management team responded by requesting an assessment of the legal basis for Altik's interpretation of USADF statutory function. USADF management further outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from the Agency's systems. Ex. B, Feleke Decl., ¶8. USADF management further explained that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act.

The U.S. DOGE Service representatives responded by noting that they would seek waivers to avoid the clearance process from the USADF Board. Ex. B, Feleke Decl., ¶ 9. Altik stated that if the Board was unable to provide immediate clearance, they would issue a notice of dismissal to all members of the Board. *Id.* The U.S. DOGE Service representatives asked for contact information for each of the members of the Board. UADF management responded that this contact information was personal and that therefore she would first need to obtain permission from the Board members to share it. The U.S. DOGE Service representatives then left the meeting and never followed up to request contact information for the Board. Ex. B, Feleke Decl., ¶¶ 9-

11. USADF management then determined that the MOU had been secured under false pretenses and accordingly revoked it. Ex. B, Feleke Decl., ¶ 12.

On Saturday, February 22, 2025, U.S. DOGE Service representatives did reach one member of the Board. They stated to this member, incorrectly, that all the other members of the Board had been terminated and asked him to implement the U.S. DOGE Service's vision of the minimum statutory functions of USADF. He declined to cooperate with the attempt to dismantle the agency.  Ex. C, Leslie Decl., ¶9.

On Monday, February 24, 2025, Ward Brehm, then a member of the Board of USADF, received a notice from the Presidential Personnel Office that he had been terminated from his position on the Board. No other Board member has received any similar notice. Ex. A, Brehm Decl., ¶¶ 9, 10.

In the afternoon of February 28, 2025, USADF management received a letter from the Presidential Personnel Office purporting to appoint Pete Marocco as the Acting Chair of the Board of USADF. Ex. C, Leslie Decl., ¶11; Ex. B, Feleke Decl., ¶ 14. No provision of law authorizes the appointment of a person to the Board of USADF on an acting basis, or on any basis other than Presidential nomination and Senate confirmation.

On the morning of March 3, 2025, the Board of USADF held an emergency meeting and determined that the purported appointment of Marocco was illegal. The Board adopted a resolution appointing Brehm as the President of USADF. Ex. A, Brehm Decl., ¶11; Ex. C, Leslie Decl., ¶13; Ex. B, Feleke Decl., ¶ 23. On the same day, the Board transmitted a memorandum to members of Congress, alerting them

to the illegal attempt to appoint Marocco to the Board, and informing Congress that Brehm was now the President of USADF.

On March 4, 2025, the Board held its regularly scheduled quarterly meeting. See United States African Development Foundation: Notice of Meeting, 90 Fed. Reg. 11037, 11037 (Mar. 3, 2025). Marocco did not attempt to attend this meeting.

On the afternoon of March 4, 2025, the U.S. DOGE Service representative, Cavanaugh, emailed USADF management to state that Marocco would arrive the next day at the offices of USADF's headquarters with software engineers who had purportedly been detailed to the Foundation. Ex. A, Brehm Decl., ¶12.

On the morning of March 5, 2025, Brehm, in his capacity as President of USADF, responded that Marocco did not legally hold any position with the Foundation, and that accordingly he had instructed USADF not to permit Marocco or any other persons from outside the agency to gain access to USADF's offices. Ex. A, Brehm Decl., ¶13. Marocco and several representatives from U.S. DOGE Service arrived at USADF's offices around mid-day on March 5, but were denied access to those offices. Marocco and his colleagues threatened to return to the offices with United States Marshals and Secret Service. Ex. A, Brehm Decl., ¶¶ 15-19; Ex. C, Leslie Decl., ¶¶ 17-18.

If Marocco is permitted to exercise authority on behalf of USADF, he intends to terminate Brehm from his position as President of USADF. Ex. A, Brehm Decl., ¶19.

**DOGE shuts down IAF**

The U.S. DOGE Service has pursued a virtually identical plan to terminate USADF's sister agency, the Inter-American Foundation (IAF). On February 20, 2025, the same day that U.S. DOGE Service representatives Shaotran and Cavanaugh initially met with USADF, they also met with representatives of IAF. As they did with USADF, the DOGE representatives told IAF that they were there to help improve IAF's software and systems. After the MOUs were signed, they then informed IAF that their real goal was to reduce the functions of IAF to what they characterized as its statutory minimum operations and requested access to IAF's systems to help them to accomplish that goal.

On February 21, 2025, representatives of IAF met again with Cavanaugh and Shaotran and an additional representative of the U.S. DOGE Service, Jacob Altik. Ex. B, Feleke Decl., ¶15. Altik stated his view that the minimum statutory requirements for IAF would be the existence of a Board and a President, a presence in the District of Columbia, and a "minimum level" of grants and contracts. DOGE accordingly intended to effectuate the reduction-in-force (RIF) of most, if not all IAF's employees, and the termination of all but a handful of IAF's grants and contracts. *Id.* The DOGE representatives stated that it was their intent that RIF notices would be sent out that day if the Board supported that action. The DOGE representatives suggested that if the Board did not agree with that plan, DOGE's intent would be to terminate the Board.

The DOGE representatives were told that it would be difficult to convene the Board immediately and that the Board was subject to certain legal requirements

before convening. The DOGE representatives stated that they were not concerned with these legal requirements and that they needed an immediate yes-or-no answer from the Board.

The DOGE representatives were also told that IAF was legally restricted under the terms of Section 7063 of Division F of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47 (2024), from initiating any reduction in IAF's functions without first providing notice to Congressional appropriations committees.

On February 24, 2025, the DOGE representative, Altik, contacted one of the members of the Board of IAF asking if that Board member would align with DOGE's vision. That Board member declined to provide Board that assurance, because he believed that DOGE's plans for the agency were unlawful.

On the evening of Friday, February 28, 2025, representatives of IAF received a communication that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of IAF. Ex. B, Feleke Decl., ¶17. The communication represented that there were no other remaining members of the Board of IAF. *Id.* But the remaining members of the Board of IAF still held (and still hold) their positions. The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had an inherent authority to do so.

That same evening, Marocco held an "emergency board meeting" outside the IAF office because no one was there to let him in. Ex. B, Feleke Decl., ¶ 17. Nate

Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member. He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of IAF.

Marocco, now representing himself to be the President of IAF, instructed the Bureau of the Fiscal Service of the U.S. Department of the Treasury to terminate all but a handful of IAF's contracts.

On Monday, March 3, 2025, Marocco and DOGE implemented a RIF of most or all IAF's employees. Ex. D, Feleke Decl., ¶ 18. Marocco and DOGE began the process of cancelling almost all IAF grants and returning outside donations. They shut all employees out of the IT systems. And they had the IAF website taken down. *Id.*

**DOGE's Activities**

DOGE Defendants' rapid and unlawful overreach against USADF is of a piece with their actions at several other federal agencies over the past month.

On January 20, 2025, hours after his inauguration, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President. The Executive Order established the role of U.S. DOGE Service Administrator within the Executive Office of the President, reporting to the White House Chief of Staff.

The Executive Order further established a temporary organization within the U.S. DOGE Service, "the U.S. DOGE Service Temporary Organization." The U.S

DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing the "President's 18-month DOGE agenda." Executive Order 14158 does not—and could not—vest any statutory authority in any of the DOGE Defendants.

Congress has neither established, nor appropriated money for, any of the DOGE Defendants. They appear to be operating at the direction of the President and at the direction of Elon Musk, who, on information and belief, either is the Acting United States DOGE Service Administrator, or is otherwise exercising substantial authority within the U.S. DOGE Service and the U.S. DOGE Service Temporary Organization.

DOGE has entered numerous federal agencies since Inauguration Day, repeating their behavior at virtually every stop: swooping in with DOGE staff, demanding access to sensitive information systems, and threatening or taking employment action against employees who resist unlawful commands.

DOGE also frequently attempts to re-work entire agencies to DOGE's will. Since Inauguration Day, DOGE personnel have sought, and in most instances, obtained, unprecedented access to information systems across numerous federal agencies, including: the United States Agency for International Development, the Department of Treasury (including the Internal Revenue Service), the Department of Labor, the Department of Health and Human Services, the Consumer Financial Protection Bureau, the National Oceanic and Atmospheric Administration, the Office of Personnel Management, the General Services Administration, the Social Security Administration, and the Department of Education.

14

In many instances, DOGE access to agency systems is initially eased by the presence of new political leadership who do not resist DOGE's unlawful access demands.

## ARGUMENT

To obtain a temporary restraining order, "the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the [temporary restraining order] were not granted; (3) that [such an order] would not substantially injure other interested parties; and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted); *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) ("[T]he same standard applies to both temporary restraining orders and to preliminary injunctions." (citation omitted)). "When the movant seeks to enjoin the government, the final two TRO factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit continue to apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks and citation omitted) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, Case. No. 22-1043 (2024

WL 34443596, at *1-2 (D.D.C. July 15, 2024)) (recognizing that district courts remain bound by sliding-scale precedent).

## I.  Plaintiff is likely to succeed on the merits.

### A.  Brehm is, at most, an inferior officer and not subject to removal by any entity other than the Board of USADF.

The Appointments Clause of the United States Constitution provides that:

> "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

U.S. Const., art. II, § 2, cl. 2.

"Only the President, with the advice and consent of the Senate, can appoint noninferior officers," that is, "principal officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021). In contrast, "the Appointments Clause permits Congress to dispense with joint appointment, but only for inferior officers. Congress may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 12-13 (internal citation omitted).

"Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond v. United States*, 520 U.S. 651, 662 (1997). In other words, an officer of the United States is "inferior" if his "work is directed and supervised at some level by" principal officers. *Id.* at 663. The D.C. Circuit applies *Edmond* by looking to three factors: "(i) whether the officer is subject

to supervision and oversight by a principal officer; (ii) whether the officer is subject to removal by a principal officer; and (iii) whether the officer has final decisionmaking authority." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021); *see also Al Bahlul v. United States*, 967 F.3d 858, 871 (D.C. Cir. 2020); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339 (D.C. Cir. 2012). Removability at will is central to this analysis; if a principal officer may remove another officer at will, the provides "a powerful tool for control," suggesting that "an officer who may be removed at will by another officer is the latter's 'alter ego' for constitutional purposes." *Fleming*, 987 F.3d at 1103.

The structure of the United States African Development Foundation's organic statute follows these constitutional principles to establish the Foundation's Board as its principal officer and the Foundation's President as (at most) an inferior officer. By statute, Congress has vested the management of USADF in a board of directors, "composed of seven members appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 290h-5(a)(1). "The management of the Foundation" is "vested" in the Board. *Id.* The Board is accordingly the principal officer of USADF for constitutional purposes.

In contrast, the President of the Foundation exercises powers only "on such terms as the Board may determine." 22 U.S.C.A. § 290h-5(d)(1). Pursuant to this authority, the Board has delegated to the President the "responsibility for directing the day to day activities of the Foundation." 22 C.F.R. § 1501.3.

17

Each of the three *Edmond* factors here leave no doubt that the President of USADF is at most an inferior officer. At all times, he is "subject to supervision and oversight" by the principal officer of the organization, the Board. *Fleming*, 987 F.3d at 1103. He is appointed by the Board to his position as the President of the Foundation, and no provision of USADF's organic statute or any other provision of law limits the Board's authority to remove him from that position. The Board thus retains the authority to replace the President of the Foundation at will, as "removal is incident to the power of appointment." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–09 (2010). And he enjoys decisionmaking authority on behalf of the Foundation only to the extent that he is "permitted to do so by other Executive officers," *i.e.*, the Board. *Arthrex, Inc.*, 594 U.S. at 14.

Because the President of the Foundation is at most an inferior officer, Brehm may be removed from his position only by his principal officer, the Board, and not by the President or by any other person. Where, as here, Congress vests the appointment of an inferior officer in the head of a department, "it is ordinarily the department head, rather than the President, who enjoys the power of removal." *Free Enter. Fund*, 561 U.S. at 493; *see also id.* at 508-09 (remedying Appointments Clause violation by leaving an inferior officer removable by a principal officer at will not by the President). Congress may depart from this ordinary rule, but, "[a]bsent relevant legislation," "the power to remove is held by the appointing authority, and *only by* the appointing authority." *Nat'l Treasury Emps. Union v. Reagan,* 663 F.2d 239, 247 (D.C. Cir. 1981) (emphasis added). "Thus, for example, an appointment authorized to

18

be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President." *Id. See also In re Hennen*, 38 U.S. 230, 260 (1839) (where Congress has vested appointment power in the head of a department, that officer holds the power of removal, and "the President has certainly no power to remove"); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 166 (1996) (citing *Hennen* for the proposition that "inferior officers appointed by a department head were not removable by the President (absent statutory authorization to do so) but by the secretary who appointed them" … "The Court's conclusions in *Hennen* ... remain good law").

Accordingly, the threatened termination of Brehm from his position as the President of the United States African Development Foundation was *ultra vires*, and Brehm lawfully retains that position.

### B. Marocco does not lawfully hold a position as a Board Member or Officer of the United States African Development Foundation.

As discussed above, the Appointments Clause forecloses a Presidential power to unilaterally appoint principal officers of the United States. The Framers believed that such an unchecked power was "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991). The Appointments Clause accordingly limits Constitution that power by "dividing" it "between the Executive and Legislative Branches." *Id.* at 884.

"The Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293–94 (2017) (quoting *Edmond*, 520 U.S. at 659; internal alterations in the original). Congress

19

recognized, however that the process of nomination and Senate confirmation "can take time," and that in some instances neither the President nor the Senate "may desire to see the duties of the vacant office go unperformed in the interim." *Id.* at 293-94. Accordingly, "Congress has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval." *Id.* at 294 (emphasis added). Even this grant of limited authority is a departure from the constitutional "norm." *NLRB v. Noel Canning*, 573 U.S. 513, 523 (2014); s*ee United States v. Maurice*, 26 F. Cas. 1211, 1213 (No. 15,747) (C.C.D. Va. 1823) (Marshall, C.J., sitting as circuit judge) ("the president shall nominate, and by and with the consent of the senate, appoint to *all* offices of the United States, with such exceptions *only* as are made in the constitution") (emphasis added).

   The Federal Vacancies Reform Act (FVRA) describes certain circumstances under which Congress has delegated to the President this limited authority to appoint acting officials. *See* 5 U.S.C. §§ 3345-3346; *SW. Gen.*, 580 U.S. at 296. These provisions "are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless another "statutory provision expressly" authorizes the President or another official to appoint an acting official or such a provision itself expressly designates an acting official, or the President validly makes a recess appointment. 5 U.S.C. § 3347(a).

The FVRA does not extend to the President this limited grant of appointment authority to vacancies arising in boards "composed of multiple members" and boards that control a "Government corporation." 5 U.S.C. § 3349c(1). The United States African Development Foundation is governed by a nonpartisan seven-member board, and it operates as a government corporation. 22 U.S.C. §§ 290h-4(b), 290h-5(a)(1). Accordingly, the FVRA does not grant the President the authority to appoint acting members of the Board of the United States African Development Foundation. And, although the FVRA acknowledges that other statutes might provide such an appointment authority, no provision in the United States African Development Foundation's organic statute (or any other source of law) grants the President the power to appoint acting board members. Instead, the statute specifies that Board members may only be appointed pursuant to the process of nomination and confirmation by the Senate. 22 U.S.C. § 290h-5(a)(1).

Because neither the FVRA nor any other provision of law contemplates the possibility of acting Board members, any vacancy in the Board of the United States African Development Foundation "shall remain vacant," 5 U.S.C. § 3348(b)(1), until such time as the position is filled through the process of Senate confirmation. And any action taken by a person who purports to be an acting member of the Foundation's Board "in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no force or effect." 5 U.S.C. § 3348(d)(1). Moreover, any such action "may not be ratified." 5 U.S.C. § 3348(d)(2).

The purported appointment of Marocco as chairman of the Board of the United States African Development Foundation is therefore void and must be treated as having no force or effect. It is our understanding that the Defendants resist this conclusion on the ground that, where (as here) no statute grants the President the authority to appoint acting officials, he must have an inherent extra-statutory authority to do so. There is no basis in the Constitution for the President to arrogate such a power to himself. The President has a means available to him to appoint officials to the Board; he may nominate persons for that role and obtain Senate confirmation for those nominations. *See* 22 U.S.C. § 290f(g). He has not even attempted to exercise that prerogative. And Congress has "addressed the problem of vacancies on various multimember agencies [including the United States African Development Foundation], providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed." *Noel Canning v. NLRB*, 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014). But even though "Congress has chosen not to provide for acting [Board] members[,] that choice cannot support" the Defendants' theory. *Id.* "We cannot accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive and legislative branches." *Id.*

The Defendants' theory was decisively rejected in *Williams v. Phillips*, 360 F. Supp. 1363, 1364 (D.D.C. 1973). In that case, President Nixon had sought to appoint an acting director of the Office of Economic Opportunity, a statutorily created agency,

so that the acting director could proceed to dismantle that office. The governing statute required Presidential nomination and Senate confirmation for the director of the office and made no provision for the appointment of an acting director. President Nixon asserted an inherent Article II authority to disregard that limitation and to appoint an acting director. The district court rejected this assertion, holding that "in the absence of such legislation or legislation vesting a temporary power of appointment in the President, the constitutional process of nomination and confirmation must be followed." *Id.* at 1371. The D.C. Circuit denied the Administration's request for a stay, similarly reasoning that "[Article] II, § 2 of the Constitution unequivocally requires an officer of the United States to be confirmed by the Senate unless different provision is made by congressional statute." *Williams v. Phillip*s, 482 F.2d 669, 670 (D.C. Cir. 1973). The court acknowledged that the merits panel might allow for a different result in cases involving appointments of acting officials for short periods during genuine emergencies but reasoned that no such emergency was present in the case before it. *Id. a*t 670 & n.1. (The appeal did not reach a decision on the merits, so the stay panel's opinion was the D.C. Circuit's final word in the case.) At all events, however, if any such limited emergency power could exist despite the absolute language of the Appointments Clause, it could not extend to a purported emergency created by the actions of the Defendants themselves. *See Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision*, 732 F. Supp. 1183, 1199–200 (D.D.C.), *appeal dismissed and remanded*, 903 F.2d 837 (D.C. Cir. 1990).

As noted above, Congress has underscored the reasoning of these cases by specifying that the FVRA provides the "exclusive means" for the appointment of acting officials in the absence of Senate confirmation. 5 U.S.C. § 3347(a). In the absence of a grant of authority from Congress to appoint an acting member of the Board of USADF, the President lacked the authority to appoint Marocco to that Board. And because Marocco has not been validly appointed as an acting member of the Board, any actions he has taken or intends to take in that capacity, or as Brehm's replacement as President of the United States African Development Foundation must be treated as void and as without effect. "The plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void ab initio, thereby rendering the rules without 'force or effect' and requiring vacatur." *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 26 (D.D.C. 2022). Plaintiff Brehm is therefore entitled to relief precluding Marocco from exercising authority on behalf of the United States African Development Foundation.

## II. Plaintiff will suffer irreparable harm unless the government's action is enjoined.

"An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). When analyzing irreparable harm, the Court assumes that the plaintiff has shown a likelihood of success on the merits. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).

Brehm suffers irreparable harm from the actions of the Defendants because they threaten to deprive him of his "statutory right to function" in the role that the Board

of USADF has lawfully appointed him to perform. *Harris v. Bessent*, No. CV 25-412 (RC), --- F. Supp. 3d ---, 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025). Any remedies at law would be inadequate to redress this injury; Brehm does not complain here of any potential loss of pay if he were to be terminated from his position, but the lost opportunity to administer USADF in accordance with its statutory mandates, as those mandates are understood by Brehm and the Board. *See id.*

What's more, Brehm's harm is irreparable because Defendants have made clear that they intend to effectively shutter the agency. From the very outset of their dealings with USADF, U.S. DOGE Service representatives have made their plans for the Foundation perfectly clear:  if they gain access to the Foundation, they will proceed to cancel all but one or two of the Foundation's contracts and grants, and they will terminate all of the Foundation's employees, in blatant contravention of USADF's statutory duty to use its appropriated funds to foster partnerships in Africa, as well as Congress's specific prohibitions against reprogramming the Foundation's funds without Congressional consultation. Put simply, if Brehm ultimately wins on the merits without emergency injunctive relief in the interim, his victory will be a hollow one, because there will be no agency left for him to manage.

The Court does not have to hypothesize about these harms—they are precisely what Defendants have done to USADF's sister agency, the Inter-American Foundation. On Friday, February 28, Trent Morse announced that Pete Marocco was the new board member of IAF, in the same email that was sent regarding USADF. Again, the email stated that, despite the FVRA's plain prohibition, the President's

Article II powers allowed the President to fill a vacancy (that the President created) instead of seeking Senate advice and consent. That afternoon, in an "emergency Board meeting"—which was Marocco, by himself, in the IAF lobby—Marocco appointed himself acting President and CEO of IAF. (There were no dissenting votes.) Within hours, Marocco directed Treasury to cancel all but a handful of IAF's contracts. The following Monday, Marocco and the DOGE team went to the IAF offices and laid off almost the entire staff, cancelled all but a few grants, shut down the IT system, and shut down the IAF website. In short, Congress created IAF over 50 years ago and has carefully funded it every year since. It took Marocco and DOGE less than 72 hours to reduce IAF to rubble. Every indication is that they plan to do the same to USADF.

### III. The balance of equities and public interest favor Plaintiff.

"It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmty. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws . . . that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). That substantial public interest is particularly acute here. If Defendants could disregard the restrictions on inferior officer removal, and the prohibition on the appointment of acting board officials that Congress put into place,

26

the Appointments Clause would be rendered to be a practical nullity. *See Harris*, 2025 WL 521027, at *8.

Congress determined that USADF be run by a bipartisan, Senate-confirmed Board and a President who takes the Board's direction and answers directly to it. *See* 22 U.S.C. §§ 290h-5(a)(1), (d)(1). The actions of the Defendants demonstrate a disregard for the structure that Congress has put in place, and the public interest weighs heavily in favor of enforcing the Congressional design. Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires immediate relief.

And there is nothing on Defendants' side of the scale: Congress created USADF "[i]n order to enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives." 22 U.S.C. § 290h-2(a). As Brehm has explained in his recent report to the Office of Management and Budget, USADF "advances US foreign policy objectives by promoting economic stability, reducing poverty, and mitigating conditions that fuel extremism and migration." Ex. D, Feleke Decl., ¶ 1. The Foundation "efficiently channels funds to underserved communities while maintaining fiscal discipline." *Id.* "The agency's mission is directly linked to promoting free enterprise and economic self-sufficiency, which aligns with the Administration's goal of reducing dependency on government aid while fostering economic partnerships that benefit American businesses." *Id.* It is not in the public interest for Defendants to ignore the Congressional purposes that USADF fulfills simply because they wish to erase an agency from existence. And Defendants will in

no way be harmed if a 44-year-old agency, with a 45-million-dollar appropriation over two years, continues to exist and function while the Court decides the merits of this case.

## CONCLUSION

For these reasons, the Court should grant the motion and enter an administrative stay and TRO until the Court can further consider the merits.

March 6, 2025                          Respectfully submitted,

                                       _/s/Bradley Girard_
                                       Bradley Girard (DC Bar No. 1033743)
                                       Joel McElvain (DC Bar No. 448431)*
                                       Robin F. Thurston (DC Bar No. 1531399)
                                       Skye Perryman (DC Bar No. 984573)
                                       Democracy Forward Foundation
                                       P.O. Box 34553
                                       Washington, DC 20043
                                       (202) 448-9090
                                       bgirard@democracyforward.org
                                       jmcelvain@democracyforward.org
                                       rthurston@democracyforward.org
                                       sperryman@democracyforward.org

                                       *motion to appear _pro hac vice_
                                       forthcoming

                                       _Counsel for Plaintiffs_