```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *    )
      WARD BREHM,                      )      Civil Action
 4                                     )      No. 25-00660
                    Plaintiff,         )
 5                                     )
         vs.                           )
 6                                     )
      PETE MAROCCO, et al.,            )      Washington, D.C.
 7                                     )      March 11, 2025
                    Defendants.        )      3:15 p.m.
 8                                     )
      * * * * * * * * * * * * * * *    )
 9


10

          TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
11              BEFORE THE HONORABLE RICHARD J. LEON
                  UNITED STATES DISTRICT JUDGE
12


13

      APPEARANCES:
14
      FOR THE PLAINTIFF:        JOEL L. McELVAIN, ESQ.
15                              ORLANDO ECONOMOS, ESQ.
                                BRADLEY GIRARD, ESQ.
16                              DEMOCRACY FORWARD FOUNDATION
                                Post Office Box 34553
17                              Washington, D.C. 20043

18
      FOR THE DEFENDANTS:       ABHISHEK KAMBLI, ESQ.
19                              U.S. DEPARTMENT OF JUSTICE
                                950 Pennsylvania Avenue, Northwest
20                              Washington, D.C. 20530

21                              JOHN BARDO, ESQ.
                                U.S. ATTORNEY'S OFFICE FOR THE
22                                DISTRICT OF COLUMBIA
                                601 D Street, Northwest
23                              Washington, D.C. 20530

24

25
```

```
 1     REPORTED BY:              LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
 2                               United States District Court for the
                                   District of Columbia
 3                               333 Constitution Avenue, Northwest
                                 Room 6706
 4                               Washington, D.C. 20001
                                 (202) 354-3269
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURTROOM DEPUTY:  We are on the record in

2     Civil Action 25-660, Ward Brehm versus Pete Marocco, et al.

3          Starting with Plaintiff's counsel, please approach

4     the podium and state your appearance for the record.

5          MR. McELVAIN:  Good afternoon, your Honor.  Joel

6     McElvain from the Democracy Forward Foundation on behalf of

7     the Plaintiff, Ward Brehm.  With me today at counsel table

8     are my colleagues Bradley Girard and Orlando Economos.

9          THE COURT:  Who was the other person you

10     mentioned?  Bradley Girard, and who is the other person?

11          MR. McELVAIN:  Orlando Economos, who either has

12     just submitted a PHV motion or that PHV motion has been --

13          THE COURT:  I don't have him on here.

14          MR. McELVAIN:  I understand, your Honor.  Thank

15     you.

16          MR. KAMBLI:  Good afternoon, your Honor.  Abhishek

17     Kambli and John Bardo on behalf of the United States.  We'll

18     be representing all the Defendants here today.

19          THE COURT:  Where are you at the Department?

20          MR. KAMBLI:  I'm at the associate's office, the

21     associate attorney general's --

22          THE COURT:  The associate attorney general?

23          MR. KAMBLI:  Yes.

24          THE COURT:  Are you deputy associate attorney

25     general?

1          MR. KAMBLI:  Yes, your Honor.

2          THE COURT:  Are you going to argue today for the

3     Government?

4          MR. KAMBLI:  Yes, your Honor.

5          THE COURT:  Okay.  Well, on TROs, I usually give

6     the moving party ten to 15 minutes.  You get to go first.

7     And then we'll hear from the other side.

8          MR. McELVAIN:  Thank you, your Honor.  May it

9     please the Court.

10          The Defendants are in a hurry.  They are in a rush

11     to shut down a series of agencies like the U.S. African

12     Development Foundation that provide grants and assistance to

13     partners in regions around the globe.  They have rushed to

14     try to place detailees at USADF using false pretenses to try

15     to gain entry to its offices.  They have rushed to try to

16     shutter the agency by trying to cancel its contracts and to

17     fire its employees.

18          But the Constitution and the governing statutes do

19     not permit the Defendants to proceed with such haste.  The

20     Appointments Clause requires presidential nomination and

21     Senate confirmation for the appointment of USADF's governing

22     board.  Now, this political process may seem too unwieldy to

23     the Defendants or it may seem too slow.  But it is the

24     process that our system, the separation of powers, demands.

25          The Defendants may not rewrite this rule book

1    simply because it seems more convenient for them to quickly

2    declare that one person has been given the authority to act

3    on behalf of the entire board.

4           Moreover, in their haste, the Defendants have

5    ignored bedrock principles of our constitutional system.

6    One such principal is that a validly appointed principal

7    officer, nominated by the president and confirmed by the

8    Senate, may not be fired from that position in secret.

9           THE COURT:  The Government says that the board at

10   the time that they elected Mr. Brehm had all been fired.

11          MR. McELVAIN:  That's incorrect, your Honor.

12          THE COURT:  Well, hold on.

13          MR. McELVAIN:  Yes.

14          THE COURT:  Slow down.  They claim that emails had

15   been sent to the board members informing them that they'd

16   been fired.  You don't doubt that the president has the

17   power to fire board members, do you?

18          MR. McELVAIN:  We have no reason to dispute that

19   the board members would be removable at will.  But the point

20   is that they have not been removed.

21          THE COURT:  Instead, you claim that Mr. Brehm was

22   the only one who received such an email.  Right?

23          MR. McELVAIN:  Correct.  I can walk through each

24   of the other four --

25          THE COURT:  So when the other four members of the

1    board voted to make Mr. Brehm the president of the

2    organization, their position is that they didn't know they

3    had been fired?

4         MR. McELVAIN:  Correct.

5         THE COURT:  And they hadn't received the email?

6         MR. McELVAIN:  Correct.

7         THE COURT:  So that's a major fact that's in

8    dispute, because if they had received the email and they had

9    been fired and they had -- they were -- they had no

10   authority to elect Mr. Brehm to be the president of the

11   organization.  Right?

12        MR. McELVAIN:  We have no reason to dispute here

13   that they'd be removable at will.  So if they had received

14   notice, then that would be that.

15        But the point is, they did not receive notice.

16   And there is no dispute of fact.  We can look at the

17   specific emails that are attached to the defense exhibits

18   and we can prove to you, email address by email address,

19   that they did not -- they were not received by the board

20   members.

21        THE COURT:  Mr. Brehm, of course, had been

22   effectively removed.

23        MR. McELVAIN:  Yes.

24        THE COURT:  He had received his email.

25        MR. McELVAIN:  Yes.  He does not dispute his

1   removal from the board.

2          THE COURT:  Right.

3          So he told them that he got it.  Right?

4          MR. McELVAIN:  Yes.

5          THE COURT:  So they knew that there was a question

6   as to whether they had gotten it.  Did any of them check

7   with the Presidential Personnel Office at the White House?

8          MR. McELVAIN:  They have checked with USADF.  They

9   checked their email addresses.  They did not receive any

10  such notice.

11         THE COURT:  Did they talk to anyone at the White

12  House?

13         MR. McELVAIN:  Not to my knowledge, your Honor.  I

14  don't have that in the record.

15         But to my understanding, I think it would be

16  reasonable to assume that, given that there had been

17  threats, that they knew it would be possible that they would

18  be removed; and in fact, they were surprised that they

19  didn't receive emails when Mr. Brehm received his email.

20         I suppose it would be reasonable to surmise that

21  the conclusion they drew from that was that one board member

22  was removed in an attempt to -- by the administration to

23  show that the administration was playing hardball and to,

24  you know, send the message that the administration was

25  serious.  But nonetheless, they never received any

1    subsequent notice that they had in fact been terminated.

2             THE COURT:  Under the statute and the regulations,

3    only the board could appoint the chairman.  Correct?

4             MR. McELVAIN:  That's correct.  That's correct.

5             THE COURT:  They were the only ones?

6             MR. McELVAIN:  That's correct.

7             And one further factual point here, Judge, I just

8    wanted to underscore is, going back to the very first day of

9    dealings with the DOGE representatives here on February

10   21st, there was a demand in that meeting with USADF staff

11   per the contact information for the board.

12            USADF staff said:  Their email addresses are

13   personal.  I need to contact them for permission to share

14   personal information.  Let me begin that process.

15            And by the time she returned, they had already

16   left.  They did not remain to get that information.  They

17   never followed up with a USADF staff member.  They just went

18   off and perhaps -- well, I can only surmise what they were

19   thinking after that.  Perhaps they attempted to Google email

20   addresses.  Who knows why they used the email addresses they

21   did.

22            THE COURT:  Who from your point of view has the

23   authority to fire Brehm?

24            MR. McELVAIN:  I'm sorry?

25            THE COURT:  Who has the authority to fire him?

1          MR. McELVAIN:  The board.

2          THE COURT:  Only the board?

3          MR. McELVAIN:  Correct.

4          THE COURT:  Not the president?

5          MR. McELVAIN:  Correct.  Correct.  That's clear in

6     our papers, and I think not even disputed in the Defendants'

7     papers, that the law is that an inferior officer is

8     removable by the authority that appointed him, but nobody

9     else -- unless Congress alters that default rule.  Congress

10    has the power to alter that default rule, but has not done

11    so here.

12          THE COURT:  Then the obvious question that leaves

13    us with is:  Is Marocco effectively and legally placed in

14    the position of chairman of the board as the only member of

15    the board?

16          MR. McELVAIN:  And he clearly has not been.

17          THE COURT:  What's the basis for you to say

18    clearly he has not been?

19          MR. McELVAIN:  Because the only two statutes that

20    could possibly give the authority to name an acting member

21    of the board would be USADF's organic statute or the Federal

22    Vacancies Reform Act.  But neither statute does so.

23          The USADF statute very clearly states that the

24    board members take their position on the board upon

25    presidential nomination and confirmation by the Senate,

1    period, full stop.

2              THE COURT:  So that's the major substantive issue

3    this case presents?

4              MR. McELVAIN:  I actually don't understand the

5    Defendants even to dispute that.  I think that -- they can

6    speak for themselves, of course.  But I believe that they

7    acknowledge that neither that statute nor the Federal

8    Vacancies Reform Act --

9              THE COURT:  Well, hold on now.  They've said that

10   he's the chairman.  He has said himself that he,

11   Mr. Marocco, is the chairman of the board and the president

12   of the organization.  That's said in the papers.

13             MR. McELVAIN:  So he has said that he is the

14   chairman of the board.  We are aware of secondhand

15   statements that he has represented himself also to be the

16   president.  We are not sure where that source of authority

17   comes from, but we are aware of that representation having

18   been made.

19             But the only possible -- and to back up, the only

20   possible way he could be president of the board would be if

21   he had been appointed to that -- I'm sorry -- president of

22   the foundation would be if he had been appointed to that

23   position by the board.

24             He is not the board.  He is not even a member of

25   the board.  And he is certainly not the entire board unto

1    himself.

2              And the reason that he is not a member of the

3    board or the entire board unto himself is that there is no

4    authority in law to appoint an acting member to the board.

5    You need Senate confirmation to appoint members to that

6    board.

7              THE COURT:  So as to Mr. Marocco, your position

8    is, even if he were to have been legally placed in as

9    president, even if he were, he couldn't be a member of the

10   board?

11             MR. McELVAIN:  Well --

12             THE COURT:  Because for the president's position,

13   he doesn't have to be a board member.  You don't have to

14   have Senate confirmation to be president?

15             MR. McELVAIN:  Correct.  But you need to be

16   appointed by the board.  And the board has not appointed him

17   to that position.

18             THE COURT:  And your fundamental position is

19   he never was, nor is he now, a member of the board?

20             MR. McELVAIN:  He never was, nor is he now.

21             And the Federal Vacancies Reform Act is quite

22   clear about that in 3348(d) that if somebody is purporting

23   to be an acting officer and is not an acting officer, any

24   action that they claim is -- to take by virtue of that

25   invalid claim of authority is necessarily *ultra vires*; and

```
1     the Court must disregard that action, set aside that action.

2              THE COURT:  So tell me where the irreparable harm

3     is to Mr. Brehm --

4              MR. McELVAIN:  So --

5              THE COURT:  -- if the Court doesn't grant the TRO.

6              MR. McELVAIN:  Well, so a few things.  First of

7     all, stemming from that provision I just cited, 3348(d),

8     because the Federal Vacancies Reform Act is phrased in

9     mandatory terms, there's actually no discretion to weigh the

10    equities here.  The Federal Vacancies Reform Act mandates

11    that his actions be set aside.  So this is -- we're actually

12    in a discretion-free zone here, given the language of the

13    statute.

14             But even if the Court were to engage in a

15    traditional balancing of the equities and a review of

16    irreparable harm, the irreparable harm to Brehm is that he

17    has been assigned a statutory duty to administer the

18    foundation.  He's been assigned that duty by the board.

19             And if -- you might argue that in some similar

20    circumstances that some officials who are temporarily

21    removed from office, but then could return at the end of the

22    day, may not suffer irreparable harm, because they might be

23    able to get back pay or they just might get their office

24    back and, you know, everything washes out at the end of the

25    day.
```

1           Here, it is quite clear from the Defendants' own

2      statements to USADF, from their actions with regard to

3      USADF's sister agency, the Inter-American Foundation, and in

4      fact evidence that just emerged today from public reporting

5      regarding USAID that there will be no agency left for him to

6      return to if the Defendants were even able to temporarily

7      take charge of the agency.

8           Their plan is to go into the agency, cancel all

9      the contracts, fire all the employees and destroy the

10     records.  So --

11          THE COURT:  Who said that?

12          MR. McELVAIN:  So that is from the --

13          THE COURT:  That's what Marocco did at USAID,

14     allegedly.

15          MR. McELVAIN:  And at the Inter-American

16     Foundation.  In our second declaration from Elizabeth

17     Feleke, which we filed today, in Paragraph 24, that

18     essentially -- assuming, which is a reasonable assumption,

19     that the Defendants did the exact same thing to USADF as

20     they are now doing to the Inter-American Foundation, it

21     would be virtually impossible for USADF to be able to

22     resume.

23          THE COURT:  Well, what about the Government's

24     representation that they don't intend to do anything to this

25     agency other than what is required by the statute?

```
1              MR. McELVAIN:  Well, I think that takes us to

2     their theory as to what is required by the statute.  They

3     have a -- I would say a unique reading of statutory

4     authorities that in their view, just because particular

5     provisions of the statute say "shall" and the statute says

6     there shall be a board, there shall be a president, that the

7     statutory minimum is to have that president, one or two

8     staff --

9              THE COURT:  A board, a president --

10             MR. McELVAIN:  A board, a president.

11             THE COURT:  -- at least a handful -- I think it's

12    three or four --

13             MR. McELVAIN:  Perhaps, yes.

14             THE COURT:  -- contracts --

15             MR. McELVAIN:  Perhaps, yes.

16             THE COURT:  -- that are being provided to

17    individuals or organizations in Africa.

18             MR. McELVAIN:  Yes.  That is their theory.  And

19    their theory, I submit, is risible.  The entire structure of

20    the statute is that USADF has a mission that has been

21    granted to it by Congress.  Congress has instructed it to

22    pursue this mission of working with partners in Africa.

23    Congress has appropriated $45 million, so not a particularly

24    large sum of money in the scope of the overall federal

25    budget, but nonetheless $45 million over the course of 2024
```

1    and 2025, to administer these grants.  And again, Congress

2    has instructed the foundation to use that appropriation to

3    distribute those grants.

4         And what's more, Congress specified that if there

5    were to be any change, you can't make any changes until you

6    come back to us and justify your plans for a reprogramming

7    of funds.

8         So it's even more specific than your usual

9    appropriation case because Congress for, you know, for

10   Congress's reasons really cares quite specifically about

11   this agency and took care to put specific instructions into

12   the -- what is the current governing appropriation statute

13   for the foundation.

14        So nothing as to what the Defendants are preparing

15   to do to this agency, again, as they are now doing to the

16   Inter-American Foundation --

17        THE COURT:  Well, at this point, it's

18   speculative that --

19        MR. McELVAIN:  I don't think it's speculative at

20   all.  These are the Defendants' own words.

21        THE COURT:  Hold on.  Do you want to hear what I

22   have to say?

23        MR. McELVAIN:  Of course I do.  Of course I do.

24   Yes.

25        THE COURT:  It would behoove you to do that.

1          MR. McELVAIN:  Yes.

2          THE COURT:  As far as I can tell from looking at

3    the pleadings, this is speculative other than what they've

4    said they're going to do.

5          You're asking the Court to assume and speculate as

6    to what they're going to do based on what happened to USAID

7    and the Inter-American Foundation.  You're asking the Court

8    to speculate, based on what happened in those agencies, in

9    this agency.

10          MR. McELVAIN:  Again, it's not speculation,

11    because I would ask the Court to look back at the record of

12    that initial meeting on February 21st, where the Defendants

13    made no bones whatsoever of what their plans for the agency

14    were.  They were coming in demanding on that day to

15    essentially shut down the agency, to --

16          THE COURT:  Who said that?

17          MR. McELVAIN:  This would have been -- I believe

18    it was Mr. Altik.  I would have to check my notes to confirm

19    that.

20          THE COURT:  Check them.

21          MR. McELVAIN:  I would be happy to do so.

22          On February 21st, there was two representatives

23    from the U.S. DOGE Service, Mr. Shaotran and Mr. Cavanaugh.

24          THE COURT:  How do you spell that first name?

25          MR. McELVAIN:  I'm looking for it, your Honor.

1    Thank you for your indulgence.  S-H-A-O-T-R-A-N.  And

2    Cavanaugh is C-A-V-A-N-A-U-G-H.

3           THE COURT:  I know how to spell that.

4           MR. McELVAIN:  Sometimes it's spelled differently.

5           THE COURT:  I thought you had said Shawshank.

6           MR. McELVAIN:  I apologize, your Honor.

7           So reviewing the course of conduct from February

8    21st forward, I really don't think there's any doubt or any

9    speculation as to what the Defendants would be doing when

10   they come into the agency.  They've made no bones whatsoever

11   as to their plan to reduce the agency to, in their words,

12   the statutory minimum.

13          Again, I think that's quite the misnomer.  I don't

14   think that there's any possible way that their theory could

15   be squared with the actual statutory obligations of the

16   foundation and the foundation's obligation to faithfully be

17   a steward of the funds that Congress has directed the

18   foundation to spend, which is why the foundation has been

19   careful to consult with Congress every step of the way.

20   They sent a report to Congress on March 3rd noting that they

21   had appointed a new president, that they had had these

22   meetings and that they do not believe that what DOGE was

23   demanding of them was consistent with the obligations that

24   Congress had imposed on the foundation.

25          THE COURT:  What if the Court concluded that it

1    was?

2            MR. McELVAIN:  If the Court concluded that it

3    would be --

4            THE COURT:  Concluded that what they were trying

5    to do was to trim down the organization in size and manpower

6    in order to still satisfy Congress's goals that they are

7    seeking to accomplish.

8            MR. McELVAIN:  They would still need to do so in a

9    constitutional manner, your Honor.  They can't run

10   roughshod over the Appointments Clause by declaring a power

11   that does not exist in the law.

12           THE COURT:  But I didn't ask you about the

13   Appointments Clause issue.  Even the Government would

14   concede that's at least an issue.

15           But with regard to the goals that they're seeking

16   to accomplish, if the Court were to conclude that the goals

17   they were seeking to accomplish were consistent with what

18   Congress wanted to achieve by creating the agency and just

19   doing it in a slimmed-down, less-employee fashion, what

20   would be the problem with that?

21           MR. McELVAIN:  Well, I do think that still has the

22   same result because, again, our claim here is specifically a

23   Vacancies Act violation and an Appointments Clause violation

24   and the unlawfulness of his -- of Brehm's purported removal

25   from his position as president of the foundation.

1          So the facts and the background as to what DOGE's

2    plans are with respect to the agency and the utter

3    irreconcilability of their theory with USADF's statutory

4    mission are important for the Court's understanding for the

5    full state of affairs of what has transpired over the last

6    two weeks or so.

7          But the --

8          THE COURT:  Well, it changes every day.  And since

9    this case was filed, the facts have changed drastically on a

10    daily basis.  This is the third day of change.

11          MR. McELVAIN:  Yes.  The facts were developing on

12    Thursday as we were finalizing our papers.

13          THE COURT:  Are you planning on filing for a

14    preliminary injunction?

15          MR. McELVAIN:  I'm sorry?

16          THE COURT:  Are you planning on filing for a

17    preliminary injunction?

18          MR. McELVAIN:  Yes.  Yes, your Honor.

19          THE COURT:  You've got until 5:00 tomorrow.

20          Anything else?

21          MR. McELVAIN:  May I inquire as to the status of

22    the foundation between now and 5:00 tomorrow?

23          THE COURT:  I'm going to issue an order.  I

24    haven't issued it yet.  I was waiting to hear the arguments.

25          MR. McELVAIN:  Okay.  Great.  Thank you, your

```
 1    Honor.

 2              MR. KAMBLI:  Good afternoon, your Honor.

 3              THE COURT:  Good afternoon.

 4              MR. KAMBLI:  So although there are big-picture

 5    constitutional issues at play in this case --

 6              THE COURT:  To say the least.

 7              MR. KAMBLI:  Yes, your Honor.

 8              Really, the case boils down to standing and

 9    irreparable harm and can be decided for the TRO on that

10    basis.

11              THE COURT:  Irreparable harm is the principal

12    focus of the Court at the moment.

13              MR. KAMBLI:  Yes, your Honor.  And I'll

14    immediately jump into that.

15              THE COURT:  Go right ahead.  Feel free.

16              MR. KAMBLI:  The Court has the authority,

17    obviously, to deny the TRO solely based on irreparable harm,

18    even if it concludes maybe the other three factors could

19    theoretically balance another way.

20              The D.C. Circuit has said:  The movant's failure

21    to show any irreparable harm is therefore grounds for

22    refusing a preliminary injunction, even if the other three

23    factors entering the calculus merit such relief.

24              And the big-picture issue is:  Who's suing?  It's

25    Mr. Brehm suing in his personal capacity.  So any
```

1    irreparable harm that he experiences must be in his personal

2    capacity.

3              But what he instead argues is that his harm is his

4    statutory right to function and his concerns that the

5    agencies may be shuttered, which he even clarifies in the

6    reply brief is effectively another way of talking about the

7    statutory right to function.

8              THE COURT:  Well, what statute is that included

9    in?

10             MR. KAMBLI:  It would be the USADF statue, which

11   would be 22 U.S. USC 290h.

12             So setting aside whether -- you know, let's leave

13   aside whether he was lawfully appointed as president for the

14   purpose of the irreparable harm argument.  The big-picture

15   issue is that the worst that happens is that he loses his

16   employment.  And no court -- and every court has always said

17   that loss of employment cannot qualify as irreparable harm

18   because the employee can be later reinstated with back pay.

19             And the idea that it's a single, unique or

20   high-level position, that's been rejected by just about

21   every circuit.

22             And just last night, in *Dellinger v. Bessent*, the

23   D.C. Circuit -- and I'll just quote what they said, just so

24   it's their words rather than mine:  Dellinger asserts that

25   he is injured by being deprived of the statutory right to

1     function in office.

2          Assuming he is correct that removal is statutorily

3     *ultra vires* and assuming that his removal constitutes a

4     cognizable injury, that does not mean such injury is

5     irreparable and weighs in his favor.

6          And it goes on to say:  At worst, Dellinger would

7     remain in office for a short -- or out of office for a short

8     period of time.

9          And that's because Dellinger was also suing in his

10    capacity.  So perhaps -- and disagreements about what -- the

11    statutory minimum of an agency, that doesn't go towards his

12    personal harm.  Perhaps if there was an entity that got a

13    contract canceled, then they could sue and maybe assert some

14    of those arguments.  But for him in particular, he can only

15    claim what harms him personally.  And that's the loss of

16    employment, which it boils down to.  And every court's been

17    consistent that that in and of itself does not constitute

18    irreparable harm.

19         And to the extent that worries about shuttering

20    the agency have any harm at all, it goes back to his

21    argument about the statutory right to function.  And in

22    *Dellinger*, they just rejected that as a basis for

23    irreparable harm.

24         THE COURT:  That came out yesterday?

25         MR. KAMBLI:  Yes, your Honor.  That came out last

 1    night.

 2              THE COURT:  Okay.

 3              MR. KAMBLI:  So it was after we filed our briefs.

 4    So we obviously did not get a chance to include that in

 5    there, or else we would have.  But we filed a notice of

 6    supplemental authority this afternoon.

 7              But basically, given that the entire purpose of a

 8    TRO is to prevent irreparable harm, there is no legally

 9    cognizable irreparable harm.  That should end the inquiry on

10    the TRO.  But if your Honor wants me to get into it, I can

11    get into the other standing problem and the merits in this

12    case.

13              THE COURT:  Well, how about a word or two on

14    likelihood of success on the merits?

15              MR. KAMBLI:  Yes, your Honor.

16              And standing goes towards likelihood of success on

17    the merits.  So, one, he has to demonstrate that he's

18    personally harmed in his personal capacity by the

19    appointment of Mr. Marocco.  And then, two, he also has to

20    demonstrate -- the likelihood of success on the merits

21    depends on whether he was lawfully appointed to be on the

22    board in the first place.

23              And before I get into whether notice is even

24    required to begin with, I would point to the Plaintiff's own

25    declaration that suggests that the board members had actual

```
 1   notice.
 2              And I would point to Paragraph 14 of the Feleke
 3   declaration, if I'm pronouncing that correctly.  It says,
 4   quote:  On February 28th, Matthew Zhaui shared an email that
 5   he received from Trent Morris that because USADF was, quote,
 6   "boardless," Peter Marocco had been appointed as acting
 7   chair -- board chair of USADF after consultations with the
 8   USADF board.  Zhaui responded that because under the USADF
 9   statute a board nomination requires Senate confirmation --
10              THE COURT:  Slow down.  Slow down.
11              MR. KAMBLI:  Sorry.  Sorry.
12              -- USADF could not recognize Marocco's authority
13   as USADF board chair.
14              And that's Paragraph 14.
15              THE COURT:  Where is the president's authority to
16   appoint without Senate confirmation --
17              MR. KAMBLI:  Yes, your Honor.
18              THE COURT:  -- people to the board?  How is that
19   possible, for the president to appoint someone --
20              MR. KAMBLI:  Yes, your Honor.
21              THE COURT:  -- who's acting?
22              MR. KAMBLI:  Yes, your Honor.  And just to
23   clarify --
24              THE COURT:  Whoa, whoa, whoa.
25              MR. KAMBLI:  Sorry.
```

1          THE COURT:  Don't talk over the judge.  It's not a

2    good practice, especially when I have a court reporter

3    trying to take us down.

4          MR. KAMBLI:  Yes.  I apologize, your Honor.

5          THE COURT:  She can't take two down at once.  Slow

6    down.

7          Now, back to my question:  By what authority is

8    the president appointing somebody to the board as an acting

9    chairman of the board without any Senate advice and consent?

10   How -- where does that come from?  Where is he getting that

11   from?

12         MR. KAMBLI:  Yes, your Honor.

13         First off, on the big-picture issue, I just wanted

14   to clarify that he --

15         THE COURT:  Well, answer my question.

16         MR. KAMBLI:  Yes, your Honor.

17         THE COURT:  Forget about the big-picture aspect.

18         MR. KAMBLI:  Yes.

19         So basically, with Mr. Marocco's designation on

20   appointing acting chair, our position is that the Federal

21   Vacancies Reform Act is not the only avenue that the

22   president has the authority to institute someone in an

23   acting capacity while there's no person left on the board.

24         THE COURT:  When you say it's your position, are

25   you telling me that OLC has opined on this?

```
 1              MR. KAMBLI:  Yes, your Honor.

 2              THE COURT:  It did.  Where did OLC opine on it?

 3              MR. KAMBLI:  Yes, your Honor.  So basically, first

 4     off, it comes from his inherent authority under Article II.

 5     And OLC has -- we've addressed it in our brief.  It was in,

 6     I believe, a 1977 and a 2001 opinion that stated that in a

 7     situation like this, where there's no one to oversee the

 8     functions or to perform the functions of a board, in order

 9     to have the agency or the board function at all, it is

10     appropriate for a reasonable period of time for the

11     president to appoint someone in an acting capacity or to

12     designate someone in an acting capacity to perform the

13     functions, provided that it's followed up with a nomination

14     to the Senate.

15              THE COURT:  He's the only board member.  He

16     appointed himself as president?

17              MR. KAMBLI:  So, your Honor, that's, I think,

18     where I wanted to clarify.

19              Under the statute, the president has the authority

20     to appoint the chairperson of the board, which is the

21     position.

22              THE COURT:  The president of the United States?

23              MR. KAMBLI:  Yes, your Honor.

24              THE COURT:  And so by what authority is

25     Mr. Marocco appointing himself president of the foundation?
```

1          MR. KAMBLI:  Yes, your Honor.  My understanding at

2     this point is that, you know, he was appointed chairperson

3     of the board.  And then obviously, there was the

4     administrative stay.  So at this point, based on the status

5     quo, as is, Mr. Brehm, per the Court's order, is the

6     president of the board.

7          But --

8          THE COURT:  Why is he telling people that he's

9     both the president and chairman of the board?

10          MR. KAMBLI:  Your Honor, I'm not sure --

11          THE COURT:  That's what's been represented in the

12     papers by the Plaintiffs.

13          MR. KAMBLI:  Your Honor --

14          THE COURT:  He's been telling people that he's not

15     only chairman of the board, but the president of the

16     foundation.

17          MR. KAMBLI:  Yes, your Honor.  And I have not been

18     able to ascertain what exactly the context of that was.

19          But our position, especially in light of the

20     administrative stay, is that at this point, because the

21     Court has ordered us to recognize Mr. Brehm as the president

22     of the board, that that's who it is right now.  And I can't

23     obviously speculate as to what happens if that were to be

24     lifted in the future, because that would be speculating on

25     future actions of the agency.

1          THE COURT:  But you do acknowledge, as Mr. -- as

2     the Plaintiff's lawyers recognize, that only the board can

3     appoint the president of the foundation?

4          MR. KAMBLI:  Your Honor, I believe that that's

5     still an open question.  And because that issue is not

6     directly before the Court, we didn't address that precise

7     issue in our brief.

8          But we do believe that the question was whether he

9     could serve as chairperson of the board under the

10    president's inherent authority under Article II, which is

11    the position that we're defending today.

12         THE COURT:  Acting chair?

13         MR. KAMBLI:  Acting chair, your Honor.  Excuse me.

14         So yes.  We believe that the Federal Vacancies

15    Reform Act doesn't provide the only avenue that someone can

16    be a designate.  And even the authority that the Plaintiffs

17    cite doesn't actually go as far as saying what they say.

18         So, for example, in *Williams v. Phillips*, the D.C.

19    Circuit actually commented on what -- on a hypothetical

20    scenario that could just as easily be applicable.  So

21    obviously, Plaintiffs noted that *Williams v. Phillips* was a

22    District of D.C. case, and the D.C. Circuit denied a stay of

23    that ruling.

24         And in its ruling, the D.C. Circuit said that

25    there could be an argument that in the absence of limiting

1    legislation, appointing an acting director for a reasonable

2    time is allowed and suggested that perhaps 30 days could be

3    a reasonable time to send a nomination to the Senate.

4              And at this point, given that Mr. Marocco had

5    basically just been appointed, there's still a reasonable

6    amount of time for the president to send nominees to the

7    Senate.

8              And the D.C. Circuit suggested that there are

9    going to be times when the Article II -- because the

10   president still has the Article II power to take care that

11   the laws are faithfully executed.  So the practice of what

12   that looks like, which is what the OLC opinions were getting

13   at, means that if an entity is boardless or without

14   officers, there should be a mechanism for the president to

15   at least temporarily ensure the functions of the agency,

16   which is the idea behind why Mr. Marocco was designated as

17   acting chairperson of the board.

18             And, your Honor, I could talk about balance of the

19   equities or other matters if the Court has any questions.

20   But if not --

21             THE COURT:  If you'd like.

22             MR. KAMBLI:  Yes, your Honor.

23             In addition to the merits as well as irreparable

24   harm, the Court has to balance the equities.  And in this

25   case, the public interest is in getting the law correct.

1     And if the Court determines that Mr. Brehm was never

2     lawfully appointed as president of the foundation, the

3     public doesn't have any interest in having him be recognized

4     as such.

5          And then in addition, the *Dellinger* case also

6     talked about what the potential injury to the government

7     looks like.  It's the injury of -- and I'll read their

8     language, rather than try to paraphrase it myself.  The D.C.

9     Circuit said, quote:  The potential injury to the government

10    of both having a designated acting special counsel sidelined

11    and unable to act while also having to try and unravel

12    Dellinger's actions is substantial.

13         So in this case, the president of the foundation

14    does get authorities over grants and how those are

15    distributed.  And once those grants are out the door,

16    there's nothing that can be done about that.

17         So it's the Government that actually does have the

18    irreparable harm in this case, while the Plaintiff in his

19    personal capacity does not.

20         So we believe that the balance of the equities

21    tips strongly in the favor of the government.

22         Thank you, your Honor.

23         THE COURT:  Thank you.

24         You can have a minute, a couple minutes.

25         MR. McELVAIN:  Very briefly, your Honor.

1            Taking the point of irreparable harm, I want to

2     emphasize that this is not a traditional case where we're

3     arguing simply about loss of employment or employment, loss

4     of back pay, a temporary deprivation that could be remedied

5     from an order down the road.

6            This is different from *Dellinger*.  This is

7     different from the other cases cited by Defendants.  What we

8     have here is a situation where, if the DOGE team is allowed

9     into this foundation, they will shutter the agency.  There

10    will be nothing left.  They will destroy the records.  They

11    will destroy the databases, as they are now doing with the

12    Inter-American Foundation.

13           So quite simply, both as a matter of irreparable

14    harm and as a matter of the balance of the equities, if the

15    TRO issues and the Government later wins, the Government

16    later at the end of the day can attempt to implement its

17    plans for the agency if they believe that they can square

18    their plans with the foundation's statutory mandates.

19           But conversely, if the TRO is denied and Brehm

20    were later to win at the end of the day, that would be a

21    hollow victory because there would be no foundation left for

22    him to return to.  The foundation would be an empty shell.

23           So the balance of the equities weigh very, very

24    heavily in favor of injunctive relief here.

25           But again, under the -- I'm sorry.  I -- if I can

1    beg the Court's indulgence.  I need to check a citation.

2         Thank you for your indulgence.  Under the

3    *AsylumWorks* case, which was cited in our opening brief, this

4    is actually not a case where there is any balancing to be

5    done because the FVRA specifies the remedy.  It is a

6    discretionless area of the law here.  If there is a

7    Vacancies Act violation, the actions of the purported acting

8    officer must be declared void, must be declared to have no

9    effect.

10        And that is *AsylumWorks versus Mayorkas*, 590

11   F.Supp. 3d 11.  It's on Page 26, DDC, 2022.

12        So for those reasons, the public interest and the

13   balance of the equities weigh heavily in favor of the

14   Plaintiff here.

15        As to standing, I mean, again, I don't want to put

16   words in the Defendants' mouths.  But I take them to no

17   longer even be relying on the five emails that they had

18   submitted with their brief.  Now they're saying that we were

19   on notice because there was another email that described the

20   foundation as boardless.

21        But any standard of notice must require us not to

22   guess at what the meaning of "boardless" means or why that

23   adjective was used.  Notice of removal is notice of removal.

24   There must be some communication that in fact the officers

25   will be removed from their positions.  And that simply has

1    not happened here.

2              Defense referred to two OLC opinions.  I just

3    wanted to briefly make some observations on those opinions.

4              Both -- the 1977 opinion involving the Federal

5    Home Loan Bank Board predates the 1998 amendments to the

6    FVRA.  And that's important, because in 1998 Congress

7    amended the Vacancies Act to specify that it was occupying

8    the field specifically to respond to attempts by the

9    administration to claim that the Vacancies Act wasn't

10   exclusive.  And so that Congress very clearly said that the

11   statute was exclusive and very clearly put forth teeth into

12   the statute, including the provision that actions of an

13   invalid acting officer must be declared to be void.

14             What's also interesting to note is that part of

15   the reasoning of this 1977 opinion was that the logic was

16   that the president needed to act because if he didn't act,

17   there would be only one member remaining of this bank board.

18   And it was obvious to OLC, so obvious that they didn't even

19   need to spell out why that was the case, that one member is

20   not the same thing as a board and one member cannot exercise

21   the authority of an entire board.

22             So even the OLC opinion that the Defendants cite

23   could not possibly support Mr. Marocco's claim to authority

24   here.

25             The 2001 OLC opinion is even further afield

1    because it doesn't even have to do with the principal

2    officer.  And the president had the authority by statute to

3    remove that principal officer.  It has nothing to do with

4    the circumstances here.

5            And just one last point:  In FVRA, the relevant

6    authority and the case law after 1998, after these

7    amendments, is the *Noel Canning* case.  And the D.C.

8    Circuit -- and the proceedings that eventually went up and

9    were affirmed by the Supreme Court, the D.C. Circuit very

10   squarely addressed a similar claim by the administration,

11   which is, yes, the FVRA is -- it can be quite restrictive.

12   It grants only limited authority to the administration.

13           The administration does not like that fact.  And

14   in particular, the administration does not like the fact

15   that it does not have authority to appoint acting members to

16   multimember boards.  But we cannot contort the Constitution

17   to allow the administration to get around the strictures of

18   the statute.

19           The statute provides that there is no such

20   authority.  And we are bound by that holding.  That's the

21   language of the D.C. Circuit opinion cited in both our first

22   brief and our reply brief.

23           And with that, I would rest unless you have any

24   further questions, your Honor.

25           THE COURT:  That's fine.  I'll issue -- you can

1    sit down.

2         I'll issue my order in the -- within the next hour

3    or so.  I want to reflect a little bit on some of the

4    arguments today.

5         I would say at the moment I'm inclined towards not

6    granting the TRO, not granting it.

7         And I'll give the Government -- I've told the

8    Plaintiff already that with regard to the PI, if you're

9    going to file a PI, you've got until 5:00 tomorrow to file a

10   PI and to submit a briefing schedule of an accelerated

11   nature.  Okay?  The PI hearing will probably be in about two

12   or three weeks.

13        And I want to give the Government fair notice of

14   the following:  You've represented to this Court in your

15   pleadings that the intentions of the Government are to have

16   a slimmed-down version.  The person who's making these

17   representations to the Department of Justice is going to be

18   required in the litigation on the PI to list in detail what

19   steps were taken by the DOGE folks.  So he or she -- or it

20   may be more than one; it may be one of each -- whatever

21   person you relied upon, they're going to be under oath to

22   report to this Court what they did in this interim between

23   today and the PI hearing.

24        And I think we probably should incorporate the

25   summary judgment into that hearing.  We might as well just,

1    instead of having three opinions, just have two.

2              So you make it very clear to that person who's

3    making those representations that if they just want a

4    slimmed-down version consistent with what Congress ordered,

5    what steps DOGE took.

6              And this shuttering concern that the Plaintiffs

7    have, I share that concern, although I don't believe it

8    meets the standard for irreparable harm at this point.  That

9    person's going to be in this courtroom and on that witness

10   seat and have to answer questions from me if it's not

11   acceptable to this Court.  Remind them of that.

12             We stand adjourned.

13             (Proceedings concluded at 3:57 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                   Dated this 12th day of March, 2025.

11

12             /s/ Lisa Edwards, RDR, CRR
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25