**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **Ward Brehm**,<br><br>               Plaintiff,<br><br>**v.**<br><br>**Pete Marocco,** *et al.*,<br><br>               Defendants. | **Civil Case No. 25-cv-660** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Introduction ......................................................................................................... 1

Factual Background ............................................................................................. 2

Argument ........................................................................................................... 16

    I.    Marocco has no legal authority to serve in any USADF role and Defendants cannot remove Brehm who was appointed President by the USADF Board. ........ 17

       A.    Marocco does not lawfully hold a position as a Board Member or Officer of the United States African Development Foundation. ......................................... 17

       B.    Brehm is, at most, an inferior officer and not subject to removal by any entity other than the Board of USADF. ................................................................. 24

       C.    Brehm is the President of USADF. ................................................................ 28

    II.    Brehm is entitled to relief. ........................................................................ 31

       A.    Brehm is entitled to an order voiding all actions of Defendants based on Marocco's invalid claim of authority. ..................................................................... 31

       B.    Brehm is entitled to injunctive relief. ......................................................... 32

       C.    Brehm is entitled to a writ of mandamus. .................................................... 37

       D.    Brehm is entitled to a declaratory judgment. .............................................. 39

Conclusion ......................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................................................................36

*Al Bahlul v. United States*, 967 F.3d 858 (D.C. Cir. 2020) .........................................25

*Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11 (D.D.C. 2022) ............................24, 31

*Beattie v. Barnhart*, 663 F. Supp. 2d 5 (D.D.C. 2009) ................................................32

*Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) ........................................................................34

*Bowerbank v. Morris*, 3 F. Cas. 1062 (C.C.D. Pa. 1801) (No. 1726) ..........................30

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ......32

*DL v. Dist. Of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) .............................................39

*Does 1-26 v. Musk*, No. CV 25-0462-TDC, 2025 WL 840574 (D. Md. Mar. 18, 2025) 37

* *Edmond v. United States*, 520 U.S. 651 (1997) ..................................................17, 25

*Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093 (D.C. Cir. 2021) .........................25, 26

*Free Enter. Fund v. Public Co. Accounting Bd.*, 561 U.S. 477 (2010) .......................27

*Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868 (1991) ....................................17

*FTC v. Flotill Prods., Inc.*, 389 U.S. 179 (1967) .........................................................23

*Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872 (D.C. Cir. 2006) ......................36

*Garland v. Cargill*, 602 U.S. 406 (2024) .....................................................................36

*George v. Ishimaru*, 849 F. Supp. 68 (D.D.C. 1994), *order vacated and appeal dismissed as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994) ........22

\* Authorities principally relied upon are marked with an asterisk

*Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665 (D.D.C. Mar. 12, 2025)..............................................................................................................33

*Harris v. Bessent*, No. CV 25-412 (RC), --- F. Supp. 3d ---, 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025) ................................................................32, 34, 39

*Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023) ......................................................38

*Immigr. and Naturalization Serv. v. Chadha*, 462 U.S. 919 (1983) ..........................22

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)..........................................................36

*In re Al Baluchi*, 952 F.3d 363 (D.C. Cir. 2020) ..........................................................37

* *In re Hennen*, 38 U.S. (13 Pet.) 230 (1839) ......................................................27, 29

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) .....................................37, 38

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332 (D.C. Cir. 2012)..............................................................................................................25

*Jones v. Hendrix*, 599 U.S. 465 (2023) .........................................................................21

*Muthana v. Pompeo*, 985 F.3d 893 (D.C. Cir. 2021)....................................................38

* *Nat'l Treasury Emps. Union v. Reagan,* 663 F.2d 239 (D.C. Cir. 1981)..................27

*New York v. Biden*, 636 F. Supp. 3d 1 (D.D.C. 2022) ..................................................39

* *NLRB v. Noel Canning*, 573 U.S. 513 (2014)............................................................18

* *NLRB v. SW Gen., Inc.*, 580 U.S. 288 (2017)................................................17, 18, 31

* *Noel Canning v. NLRB*, 705 F.3d 490 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014)..............................................................................22, 24

*POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40 (D.D.C. 2012) ..............................39

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)..............21

*Shawnee Tribe v. Mnuchin*, 984 F.3d 94 (D.C. Cir. 2021) ..........................................34

\* Authorities principally relied upon are marked with an asterisk

iii

*Train v. City of New York*, 420 U.S. 35 (1975) ............................................................ 36

*United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419 (2023) ..........21

*United States v. Am. Tobacco Co.,* 221 U.S. 106 (1911) ............................................ 21

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ..................................................25, 26

*United States v. Maurice*, 26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747) ...............18

*United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483 (2001) ................32

*Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914 (D.D.C. Mar. 6, 2025) ....33

*Will v. United States*, 389 U.S. 90 (1967)..................................................................37

**Statutes**

2 U.S.C. § 683................................................................................................................36

22 U.S.C. § 290h........................................................................19, 22, 23, 26, 28, 34, 35

5 U.S.C. § 3345 ..............................................................................................................18

5 U.S.C. § 3347 ........................................................................................................18, 24

5 U.S.C. § 3348 ..................................................................................19, 20, 21, 31

* 5 U.S.C. § 3349c ...............................................................................................19, 20, 21

5 U.S.C. §§ 3345 ...........................................................................................................18

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47,
    138 Stat. 460 (2024) ..............................................................................................4, 35

**Constitutional Provisions**

* U.S. Const., art. II..................................................................................................17

* Authorities principally relied upon are marked with an asterisk

## Other Authorities

22 C.F.R. § 1501.3 (1985) ................................................................................ 26

*Authority of the President to Remove the Staff Director of the Civil Rights
    Commission and Appoint an Acting Staff Director*, 25 Op. O.L.C. 103 (2001) ...... 24

*Creation of the Federal Judiciary: A Review of the Debates in the Federal and States
    Constitutional Conventions; and Other Papers,*
    S. Doc. No. 75-91 (1st Sess. 1937) ............................................................... 30

*Power of the President to Designate Acting Member of the Federal Home Loan Bank
    Board*, 1 Op. O.L.C. 150 (1977) ................................................................. 23

S. Rep. No. 105-250 (1998) .......................................................................... 18

*Temporary Presidential Designation of Acting Board Members of the Inter-American
    Foundation and the United States African Development Foundation*, 49 Op.
    O.L.C. ___ (Mar. 14, 2025) ........................................................................ 20

*The Constitutional Separation of Powers Between the President and Congress*, 20
    Op. O.L.C. 124 (1996) ................................................................................. 27

## INTRODUCTION

Plaintiff Ward Brehm is the President and CEO of the United States African Development Foundation, a congressionally created agency. He was duly appointed by the Board of Directors, as authorized by statute. Despite the clear statutory requirement that USADF "shall have perpetual succession unless dissolved by an Act of Congress," 22 U.S.C. § 290h-4(a)(1), Defendants are dead-set on shuttering the agency.

On February 21, President Trump issued an Executive Order describing USADF as "unnecessary." Within days, Defendants launched a full-on assault against USADF. First, DOGE tried to gain access to the agency under false pretenses to cancel all grants and contracts. That failed, so DOGE employees began threatening members of the Board with termination. When the Board maintained that it would carry out its statutory duties, Defendants simply pretended there was no longer a Board (despite there still being four properly appointed board members, none of whom had received any notification of termination). Defendants then insisted that President Trump did not need to follow the required process for advice and consent of the Senate and that he could instead directly appoint Pete Marocco to be the sole board member. Marocco has since purported to install himself as President and CEO in Brehm's place.

This is not a case about whether government should be more efficient. Nor is it a case about what Congress requires of USADF. The question here is whether

1

Defendants can simply ignore a host of constitutional and statutory requirements to impose their desired structure of an agency. They cannot.

## FACTUAL BACKGROUND

### The United States African Development Foundation

Congress established the United States African Development Foundation as a "body corporate," 22 U.S.C. § 290h-1(a), to fulfill the statutory purposes "to enable the people of African countries to develop their potential, fulfill their aspirations, and enjoy better, more productive lives"; "to strengthen the bonds of friendship and understanding between the people of Africa and the United States"; "to support self-help activities at the local level designed to enlarge opportunities for community development"; "to stimulate and assist effective and expanding participation of Africans in their development process"; and "to encourage the establishment and growth of development institutions which are indigenous to particular countries in Africa and which can respond to the requirements of the poor in those countries." 22 U.S.C. § 290h-2(a).

Congress instructed USADF to carry out these purposes "in cooperation with, and in response to, organizations indigenous to Africa which are representative of the needs and aspirations of the poor in Africa," and directed that USADF shall "to the extent possible, coordinate its development assistance activities with the activities of the United States Government and private, regional, and international organizations." 22 U.S.C. § 290h-2(b).

To fulfill these statutory purposes, Congress authorized USADF to "make grants, loans, and loan guarantees"—not to exceed $250,000 for any particular project—"to any African private or public group (including public international organizations), association, or other entity engaged in peaceful activities" including "the fostering of local development institutions," "the development of self-evaluation techniques by participants in projects supported" by USADF, "development research by Africans and the transfer of development resources," and "the procurement of such technical or other assistance as is deemed appropriate by the recipient of such grant, loan, or guarantee." 22 U.S.C. § 290h-3(a).

In making grants, loans, and loan guarantees under subsection (a) of this section, Congress directed that "the Foundation shall give priority to projects which community groups undertake to foster their own development and in the initiation, design, implementation, and evaluation of which there is the maximum feasible participation of the poor." 22 U.S.C. § 290h-3(b).

Congress specified that USADF, "as a corporation," "shall have perpetual succession unless dissolved by an Act of Congress." 22 U.S.C. § 290h-4(a)(1). Congress empowered USADF to "prescribe, amend, and repeal such rules and regulations as may be necessary for carrying out the functions of the Foundation"; to "make and perform such contracts and other agreements with any individual, corporation, or other private or public entity however designated and wherever situated, as may be necessary for carrying out the functions of the Foundation"; and to "determine and

prescribe the manner in which its obligations shall be incurred and its expenses allowed and paid[.]" 22 U.S.C. § 290h-4(a).

The management of USADF is vested in a board of directors, composed of seven members appointed by the President, by and with the advice and consent of the Senate. 22 U.S.C. § 290h-5(a). All members of the Board shall be appointed "on the basis of their understanding of and sensitivity to community level development processes." *Id*. Members of the Board shall be appointed so that no more than four members of the Board are members of any one political party. *Id*.

The Board of USADF manages the entity through the appointment of a President, who exercises authority on such terms as the Board shall determine, and an Advisory Council. 22 U.S.C. § 290h-5(d), (e).

Congress has appropriated to USADF, "[f]or necessary expenses to carry out the African Development Foundation Act," $45 million to remain available until September 30, 2025. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. 460, 746 (2024). Congress prohibited USADF from using any appropriated funds to "implement a reorganization, redesign, or other plan," that would "expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations" or "expand, eliminate, consolidate, or downsize the United States official presence overseas," without first consulting with the Appropriations Committees of both houses and providing a detailed justification for any such plan. *Id*., § 7063(a), (b), 138 Stat. at 843-44.

USADF was "established by Congress to invest directly in African grassroots enterprises and social entrepreneurs." United States African Development Foundation, https://perma.cc/N5BB-4RP6 (last accessed Mar. 20, 2025). USADF provides grant funds, among other resources, "to develop, grow and scale African enterprises and entrepreneurs who improve lives and livelihoods." *Id*. "USADF's investments increase incomes, revenues, and jobs by promoting self-reliance and market-based solutions to poverty." *Id*. USADF works with partners in 22 African countries, focusing on "populations least served by existing markets or assistance programs" with the goal of helping them "transition out of poverty." *Id*.

In fiscal year 2024, USADF made significant investments to drive growth in key sectors, including $16.56 million across 114 grants enhancing agriculture, $7.37 million across 34 grants expanding off-grid energy access, and $4.19 million across 94 grants advancing youth and women entrepreneurship. *Id*.; Ex. A, Brehm Decl. ¶ 2.

**February 19 Executive Order**

On February 19, President Trump signed an executive order titled "Commencing the Reduction of the Federal Bureaucracy." Exec. Order No. 14,217, 90 Fed. Reg. 10577 (Feb. 19, 2025). The purpose of the executive order is to "reduce the size of the Federal Government," especially the elements "that the President has determined are unnecessary." *Id*. § 1.

The executive order list federal entities that "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the minimum presence and

function required by law." *Id.* § 2(a). The executive order lists USADF as one of the targeted entities.

Under the executive order, "the head of each unnecessary governmental entity" had 14 days to submit a report to the Director of the Office of Management and Budget "confirming compliance with this order and stating whether the governmental entity, or any components or functions thereof, are statutorily required and to what extent." *Id.* § 2(b).

In response to the reports submitted by targeted entities, "the OMB Director or the head of any executive department or agency charged with reviewing grant requests by such entities shall, to the extent consistent with applicable law and except insofar as necessary to effectuate an expected termination, reject funding requests for such governmental entities to the extent they are inconsistent with this order." *Id.* § 2(c).

The executive order "shall [not] be construed to impair or otherwise effect," among other things, "the authority granted by law to an executive department, agency, or the head thereof" and "shall be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3. The executive order does not give the U.S. DOGE Service any role to play in its implementation.

**DOGE's attempts to shut down USADF**

On February 20, the day after the executive order was issued, Chris Young, a representative of the U.S. DOGE Service, met with members of the USADF leadership team. Ex. B, Feleke Decl. ¶ 7; Ex. C, Leslie Decl. ¶ 7. At the meeting,

Young described the intent of the U.S. DOGE Service that two engineers from the General Services Administration (GSA) would be detailed to USADF to provide software expertise to modernize architecture, system design, and improve government efficiency. Ex. B, Feleke Decl. ¶ 7. That evening, Young submitted two memoranda of understanding (MOUs) for a detail assignment between GSA and USADF for Ethan Shaotran and Nate Cavanaugh which similarly described the scope of these individuals' details. Ex. B, Feleke Decl. ¶¶ 7-9; Ex. E, Memorandum of Understanding. The effective period of both detail assignments was to be from February 20, 2025, through July 4, 2026. *Id.*

The next day, Shaotran and Cavanaugh, accompanied by Jake Altik, a lawyer from the U.S. DOGE Service, arrived at USADF and met with USADF's leadership team. During this meeting the parties signed the MOUs that had been provided the night before. Ex. B, Feleke Decl. ¶ 8. The U.S. DOGE Service team then proceeded to describe their true purpose for arriving at USADF, which was to reduce the functions of the Foundation to the "minimum presence and function" required under their reading of the African Development Foundation Act, which in their view required only that the Foundation retain its Board and President and that the agency maintain only one or two grants funded by private sector partnerships. Ex. B, Feleke Decl. ¶ 9. In their view, all other personnel of the agency would be eliminated to fulfill the executive order. *Id.*

The U.S. DOGE Service representatives demanded immediate access to USADF systems including financial records, payment and human resources systems to

include staff job descriptions, personnel files, salaries, and organizational structure. *Id.* ¶ 11. The USADF management team responded by requesting an assessment of the legal basis for Altik's interpretation of USADF statutory function. USADF management further outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from the Agency's systems. *Id.* ¶ 12. USADF management further explained that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act.

The U.S. DOGE Service representatives responded by noting that they would seek waivers to avoid the clearance process from the USADF Board. *Id.* ¶ 13. Altik threatened that if the Board was unable to provide immediate clearance, they would issue a notice of dismissal to all members of the Board. *Id.* The U.S. DOGE Service representatives asked for contact information for each of the members of the Board. *Id.* USADF management responded that this contact information was personal and that therefore she would first need to obtain permission from the Board members to share it. *Id.* ¶ 14. Annoyed at having to wait, the U.S. DOGE Service representatives began searching the internet for contact information. *Id.* ¶ 14. They were able to find the phone number of one Board member, *id.* ¶ 15, but that Board member told them it was not possible to convene the Board on a Friday afternoon. Ex. C, Leslie Decl. ¶ 9. They left before the USADF staff could provide the Board's contact information and never followed up to request it. Ex. A, Feleke Decl. ¶ 18.

That afternoon, USADF's management determined that the MOU had been secured under false pretenses and accordingly revoked it. *Id.* ¶ 19. So the U.S. DOGE Service representatives were no longer detailed to USADF.

Nevertheless, the next day (a Saturday), U.S. DOGE Service representatives again called the member of the Board with whom they had spoken the day before. Ex. C, Leslie Decl. ¶ 9. They stated to this member, incorrectly, that all the other members of the Board had been terminated and asked him to implement the U.S. DOGE Service's vision of the minimum statutory functions of USADF. *Id.* He declined to cooperate with the attempt to dismantle the agency. *Id.*

On Monday, February 24, Ward Brehm, then a member of the Board of USADF, received a notice from the Presidential Personnel Office that he had been terminated from his position on the Board. Ex. A, Brehm Decl. ¶¶ 9, 10. The other Board members checked, but none had received any similar notice. Ex. C, Leslie Decl. ¶ 10. At least one Board member thought that he might be removed in the near future, but was "at no point" under the impression that he had been removed. *Id.*, ¶ 11.

On February 28, USADF management received a letter from the Presidential Personnel Office purporting to appoint Pete Marocco as the Acting Chair of the Board of USADF. Ex. C, Leslie Decl. ¶ 12; Ex. B, Feleke Decl. ¶ 27. No provision of law authorizes the appointment of a person to the Board of USADF on an acting basis, or on any basis other than Presidential nomination and Senate confirmation.

On March 3, after determining that the purported appointment of Marocco was illegal, Ex. B, Feleke Decl. ¶ 27, the Board met and adopted a resolution appointing

Brehm as the President of USADF, in fulfillment of its statutory duty under 22 U.S.C. § 290h-5(d) to appoint that officer. *United States African Development Foundation: Resolution of the Board of Directors Appointment of USADF Presiden*t, 90 Fed. Reg. 11596 (Mar. 10, 2025); Ex. A, Brehm Decl. ¶ 11; Ex. C, Leslie Decl. ¶ 14. On the same day, the Board transmitted a memorandum to members of Congress, alerting them to the illegal attempt to appoint Marocco to the Board, and informing Congress that Brehm was now the President of USADF. Ex. H, Memorandum from the USADF Bd. of Directors to the Subcomm. on State, Foreign Operations and Related Programs (Mar. 3, 2025).

On March 4, the Board held its regularly scheduled, pre-announced, and publicly accessible quarterly meeting. *See United States African Development Foundation: Notice of Meeting*, 90 Fed. Reg. 11037, 11037 (Mar. 3, 2025). Despite having claimed to be the only Board member, Marocco did not attend this meeting. Ex. C, Leslie Decl. ¶ 16.

Yet that afternoon, U.S. DOGE Service representative Nate Cavanaugh emailed USADF management to state that Marocco would arrive the next day at the offices of USADF's headquarters with software engineers who had purportedly been detailed to the Foundation. Ex. A, Brehm Decl. ¶ 12. Brehm, in his capacity as President of USADF, responded that Marocco did not legally hold any position with the Foundation, and that accordingly he had instructed USADF not to permit Marocco or any other persons from outside the agency to gain access to USADF's offices. *Id.* ¶¶ 13, 17. Marocco and several representatives from U.S. DOGE Service arrived at

USADF's offices around mid-day on March 5, but were denied access. Ex. C, Leslie Decl. ¶ 19. Marocco and his colleagues threatened to sue the building's private security guard and threatened to return with United States Marshals and Secret Service. Ex. A, Brehm Decl. ¶¶ 15-19; Ex. C, Leslie Decl. ¶¶ 18-19.

The next day, they did just that. Marocco and his associates, accompanied by an individual purporting to be a U.S. Marshal, gained access to USADF's offices, and shut all USADF staff out by revoking key card access, disabling door access, and locking the front door. Ex. B, Feleke Decl. ¶¶ 34-41. They rifled through staff's offices and desks, moving documents and furniture in their wake. *Id.* ¶ 42. While at the USADF office, Marocco purported to hold a meeting of the Board, consisting only of himself; the minutes of that meeting recite that "Pete vote [sic] to close the meeting to the public," voted to terminate "Ward Brem" from his position as President of USADF, and voted to appoint himself in Brehm's place as acting President and CEO of the Foundation. Ex. L.

Since then, DOGE representatives, including Nate Cavanaugh, have continually demanded access to sensitive information systems containing human resources data for the Foundation, without regard for the legal process for gaining such access. Ex. B, Feleke Decl. ¶¶ 43-54. In response to emails informing Cavanaugh that access requests must be processed by filling out a form and having it signed by the Chief Financial Officer of the Foundation, Cavanaugh said that Marocco had been appointed by President Trump as the new Acting Chairman of USADF, and that Marocco was ordering that access be granted. *Id.* ¶ 46. Access was ultimately provided

11

to Marocco by the Interior Business Center of the U.S. Department of the Interior on
March 14. *Id.* ¶ 49.

On March 17, five USADF junior and mid-level staff received the same request
from a new DOGE staffer—Justin Fox—and were given a deadline of the same day
to reply. *Id.* ¶ 50. Fox stated that he was contacting USADF on behalf of Marocco,
whom he described as the President of the Foundation. *Id.* The staff informed Fox
that they were not authorized to provide access, and that such requests should be
directed to senior leadership. *Id.* ¶ 51. Marocco intervened, stating that it was a
formal request, and Fox then told them that refusal would be taken as an indication
that they wished to no longer continue employment at USADF. *Id.* ¶¶ 51-52. Afraid
of losing their jobs for failing to provide access when not authorized to do so, the staff
forwarded the correspondence to USADF's General Counsel. *Id.* ¶ 53. The General
Counsel informed Marocco and Fox that to avoid further complications, access would
be granted. *Id.* ¶ 54. She asked Marocco for the purpose of such access; she received
no reply. *Id.*

The next day, March 18, Marocco, again under his purported authority as Acting
Chair and President of USADF, placed all USADF staff on administrative leave,
specifying that they are not permitted on USADF premises, that they are prohibited
from accessing USADF systems, and that they may not act without Marocco's
permission. *Id.* ¶ 55. As of March 19, only three federal employees at USADF, all in
senior leadership positions, had not yet received notice placing them on
administrative leave. *Id.* ¶ 56.

12

On March 19, Marocco emailed USADF's General Counsel stating, "as Mr. Brehm's claims and employment have been dealt with, hopefully you and I can proceed without issue. I need access to review grants as Acting CEO and President." *Id.* ¶ 57.

**DOGE shuts down IAF**

The U.S. DOGE Service has pursued a virtually identical plan to terminate USADF's sister agency, the Inter-American Foundation (IAF). On February 20, the same day that U.S. DOGE Service representatives Shaotran and Cavanaugh initially met with USADF, they also met with representatives of IAF. Decl. of Sara Aviel ¶ 7, *Aviel v. Gor*, No. 1:25-cv-00778-LLA (D.D.C. Mar. 17, 2025), ECF No. 5-2. The DOGE representatives informed IAF that their plan was to reduce the functions of IAF to what they characterized as its statutory minimum operations—a board, a president, a presence in the District of Columbia, and a minimal level of contracts and grants— and sought access to IAF's systems to help them to accomplish that goal. *Id.* ¶ 9. The president of IAF, Sara Aviel, declined that request. On February 26, Aviel received an email from the Presidential Personnel Office purporting to terminate her from her position. *Id.* ¶ 14.

On the evening of Friday, February 28, representatives of IAF received a communication that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of IAF. Ex. B, Feleke Decl. ¶ 30. The communication represented that there were no other remaining members of the Board of IAF. *Id.* But the remaining members of the Board of IAF still held (and still

hold) their positions. Aviel Decl., ¶ 13. The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had an inherent authority to do so. *Id.* ¶ 15 & Ex. A.

That same evening, Marocco held an impromptu meeting of the IAF Board outside the IAF office because no one was there to let him in. Ex. B, Feleke Decl. ¶ 30. Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member. He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of IAF. Aviel Decl. ¶ 16.

Marocco, now representing himself to be the President of IAF, instructed the Bureau of the Fiscal Service of the U.S. Department of the Treasury to terminate all but a handful of IAF's contracts. *Id.* ¶ 17. On Monday, March 3, Marocco and DOGE implemented a RIF of almost all IAF's employees. *Id.* ¶ 19. Marocco and DOGE began the process of cancelling all but one of IAF's grants and returning outside donations. *Id.* ¶ 20. The sole remaining grant, in the amount of $66,000, is scheduled to expire soon. *Id.*

**DOGE infiltrates USIP**

DOGE pulled out the same playbook at the United States Institute of Peace, another entity targeted in the February 19 executive order. On February 24, USIP leadership set up a meeting with DOGE personnel, including Cavanaugh, Altik, and James Burnham, the General Counsel of DOGE, where USIP explained that it is an independent non-profit organization. Decl. of George Moose ¶¶ 5-6, *U.S. Inst. of Peace*

*v. Jackson*, No. 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-2. The DOGE team explained what they considered to be the statutory minimum function of USIP: a Board of Directors and a president, reports to Congress and the Executive branch, and expenses incident to the Board of Directors. *Id.* ¶ 7.

On March 8, USIP President George Moose received word that DOGE personnel were inquiring into the security operations of USIP to gain access to its offices and databases. *Id.* ¶ 8-9. Moose replied that USIP is an independent non-profit entity, and that its headquarters are privately owned and its security is not handled by the federal government. *Id.* On March 14, Trent Morse of the White House Presidential Personnel Office emailed members of the USIP Board (who are statutorily protected from termination without cause) a single sentence asserting that they had been removed from the Board by President Trump without explanation or cause. *Id.* ¶ 10; Decl. of George Foote ¶ 7, *U.S. Inst. of Peace v. Jackson*, 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-5. The same day, DOGE personnel attempted repeatedly to enter USIP headquarters and presented USIP's General Counsel, George Foote, with a "resolution" purporting to remove Moose as president. *Id.* ¶ 9.

On March 16, USIP suspended its contract with its private security contractor, Inter-Con. Decl. of Colin O'Brien ¶ 4, *U.S. Inst. of Peace v. Jackson*, 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-8. Inter-Con ID card access was revoked and all but one physical keys returned. *Id.* But the next day, four Inter-Con personnel arrived at USIP headquarters with DOGE employees and used the one physical key they still

had to gain access. *Id.* ¶ 5; Moose Decl. ¶ 16-17. Foote informed them that they were trespassing; they ignored him and approached USIP's gun safe. Foote Decl. ¶ 18. So Foote called D.C. Metropolitan Police. *Id.* ¶ 19. When the police arrived, however, they let DOGE personnel, including into the building by picking the locks on the doors. Foote Decl. ¶ 25; O'Brien Decl. ¶ 25. D.C. Police informed Foote that they believed Jackson to be the President of USIP, and escorted Foote, Moose, O'Brien, and their colleagues from the building. *Id.* ¶ 26; Moose Decl. ¶ 17-18; O'Brien Decl. ¶ 24. They have not been allowed to return. Foote Decl. ¶ 26.

## ARGUMENT

Defendants are attempting to seize all power over—and effectively shut down—another agency. They insist that their acts are in the name of "efficiency" and are carrying out President Trump's executive order that declared USADF "unnecessary." The political wisdom of their goal is not at issue in this case. USADF was created by Congress, structured by Congress, and is annually funded by Congress. Those statutes—in addition to those implementing Congress's constitutional powers of appointment and removal—cannot be ignored because Defendants believe that they are inefficient or inconvenient. Yet that is precisely what Defendants urge this Court to allow.

With no legal authority, and in direct contravention of the Federal Vacancies Reform Act, Defendants decreed that Pete Marocco is the sole Board member USADF. Marocco then ordained himself President and CEO. But USADF already has a duly appointed President—Ward Brehm. Because Defendants' actions have no basis in

law, summary judgment should be granted in Brehm's favor and Defendants' actions determined void. Alternatively, the Court should grant Brehm a preliminary injunction.

## I. Marocco has no legal authority to serve in any USADF role and Defendants cannot remove Brehm who was appointed President by the USADF Board.

### A. Marocco does not lawfully hold a position as a Board Member or Officer of the United States African Development Foundation.

The Appointments Clause of the United States Constitution forecloses a Presidential power to unilaterally appoint principal officers of the United States. The Framers believed that such an unchecked power was "the most insidious and powerful weapon of eighteenth century despotism." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 883 (1991). The Appointments Clause provides that:

> "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

U.S. Const., art. II, § 2, cl. 2.

The Clause accordingly limits the appointment power by "dividing" it "between the Executive and Legislative Branches." *Freytag,* 501 U.S. at 884. "The Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme.'" *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 293–94 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997); internal alterations in the original). Congress recognized, however that the process of nomination and Senate confirmation "can

take time," and that in some instances neither the President nor the Senate "may desire to see the duties of the vacant office go unperformed in the interim." *Id.* Accordingly, "Congress has given the President *limited authority* to appoint acting officials to temporarily perform the functions of a vacant [principal] office without first obtaining Senate approval." *Id.* at 294 (emphasis added). Even this grant of limited authority is a departure from the constitutional "norm," *NLRB v. Noel Canning*, 573 U.S. 513, 523 (2014), and thus must be narrowly construed. *See United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (No. 15,747) (Marshall, C.J., sitting as circuit judge) ("the president shall nominate, and by and with the consent of the senate, appoint to *all* offices of the United States, with such exceptions *only* as are made in the constitution") (emphasis added).

The Federal Vacancies Reform Act (FVRA) describes certain circumstances under which Congress has delegated to the President this limited authority to appoint acting officials. *See* 5 U.S.C. §§ 3345-3346; *SW Gen.*, 580 U.S. at 294-96. These provisions "are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which appointment is required to be made by the President, by and with the advice and consent of the Senate," unless another "statutory provision expressly" authorizes the President or another official to appoint an acting official or such a provision itself expressly designates an acting official, or the President validly makes a recess appointment. 5 U.S.C. § 3347(a). *See also* S. Rep. No. 105-250, at 11 (1998) (Congress

enacted the FVRA "to ensure the exclusivity of the applicability of the Vacancies Act").

The FVRA does not extend to the President this limited grant of appointment authority to vacancies arising in boards "composed of multiple members" and boards that control a "Government corporation." 5 U.S.C. § 3349c(1). The United States African Development Foundation is governed by a nonpartisan seven-member board, and it operates as a government corporation. 22 U.S.C. §§ 290h-4(b), 290h-5(a)(1). Accordingly, the FVRA does not grant the President the authority to appoint acting members of the Board of the United States African Development Foundation. And, although the FVRA acknowledges that other statutes might provide such an appointment authority, no provision in the United States African Development Foundation's organic statute (or any other source of law) grants the President the power to appoint acting board members. Instead, the statute specifies that Board members may only be appointed pursuant to the process of nomination and confirmation by the Senate. *Id.* § 290h-5(a)(1).

Because neither the FVRA nor any other provision of law contemplates the possibility of acting Board members, any vacancy in the Board of the United States African Development Foundation "shall remain vacant," 5 U.S.C. § 3348(b)(1), until such time as the position is filled through the process of Senate confirmation. And any action taken by a person who purports to be an acting member of the Foundation's Board "in the performance of any function or duty of a vacant office to which this section and sections 3346, 3347, 3349, 3349a, 3349b, and 3349c apply shall have no

force or effect." *Id*. § 3348(d)(1). Moreover, any such action "may not be ratified." *Id*. § 3348(d)(2).

The purported appointment of Marocco as chairman of the Board of the United States African Development Foundation is therefore void and must be treated as having no force or effect. Defendants resist this conclusion through a tortured reading of the FVRA. They acknowledge, as they must, that the FVRA provides the exclusive means to appoint an acting official and that the FVRA excludes the appointment of a member of a multi-member board (like USADF) on an acting basis. Defs.' Mem. in Opp'n to TRO at 13 (Mar. 10, 2025), ECF No. 10. From there, they contend that because the FVRA excludes boards like USADF's, see 5 U.S.C. § 3349c, it excludes those boards from the entirety of the law—including the statute's plain statement that it is the "exclusive means" of appointment of acting officials. *Id*. Therefore, according to Defendants, the President holds implicit Article II authority to appoint acting members to the Board. *Id*; *see also Temporary Presidential Designation of Acting Board Members of the Inter-American Foundation and the United States African Development Foundation*, 49 Op. O.L.C. ___ (Mar. 14, 2025) (recapitulating this line of reasoning).

But in the FVRA's plain language, Congress contemplated and rejected Defendants' argument—the statute specifies that "an action taken by any person who is not acting . . . in the performance of any function or duty of a vacant office to which this section and sections . . . 3349c apply shall have no force or effect," and "may not be ratified." 5 U.S.C. § 3348(d)(1), (2). Section 3349c, as noted above, is the provision

that confirms that Congress withheld authority from the President to appoint acting members to multi-member boards. Put another way, under Section 3348, when Section 3349c excludes multi-member boards from appointments of acting officers, the rest of the FVRA still applies.

And there is no cause to read the FVRA, like Defendants do, to be "at war with itself." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 434 (2023) (quoting *United States v. Am. Tobacco Co.,* 221 U.S. 106, 180 (1911)). Sections 3348 and 3349c are easily read (and thus must be read) to be in harmony with each other. *See Jones v. Hendrix*, 599 U.S. 465, 478 (2023). Section 3349c provides that the preceding provisions of the FVRA shall not apply to Presidentially-nominated and Senate-confirmed members of multi-member boards, 5 U.S.C. § 3349c(1). Section 3348, in contrast, specifies the rules for persons who are (invalidly) appointed to such boards *without* Senate confirmation: their seats shall remain vacant, and their actions shall be deemed to be without force and effect. 5 U.S.C. § 3348(b), (d). In any event, even if there were any conflict between Section 3348 and Section 3349c, the specific language of the first provision invalidating any actions of invalidly appointed board members would control over the general language of the latter provision. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 646 (2012).

In the absence of any statutory grounding for their assertion of power, there is no basis in the Constitution for the President to arrogate such a power to himself. The President has a means available to him to appoint officials to the Board; he may nominate persons for that role and obtain Senate confirmation for those nominations.

21

*See* 22 U.S.C. § 290h-5(a). And Congress has "addressed the problem of vacancies on various multimember agencies [including the United States African Development Foundation], providing that members may continue to serve for some period past the expiration of their commissions until successors are nominated and confirmed." *Noel Canning v. NLRB*, 705 F.3d 490, 511 (D.C. Cir. 2013), *aff'd*, 573 U.S. 513 (2014). But even though "Congress has chosen not to provide for acting [Board] members[,] that choice cannot support" the Defendants' theory. *Id.* "We cannot accept an interpretation of the Constitution completely divorced from its original meaning in order to resolve exigencies created by—and equally remediable by—the executive and legislative branches." *Id.* This remains so even "if some administrative inefficiency results from" applying the requirements of the Appointments Clause, because those concerns "do not empower [the Court] to change what the Constitution commands." *Id.* After all, "convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government." *Id.* (quoting *Immigr. and Naturalization Serv. v. Chadha*, 462 U.S. 919, 944 (1983)).

For this reason, "[n]o court"—either before or after Congress's 1998 enactment of the FVRA as the exclusive vehicle for the appointment of acting officers—"has ever recognized that the President has such inherent authority" to appoint officers without Congressional authorization." *George v. Ishimaru*, 849 F. Supp. 68, 72 (D.D.C. 1994), *order vacated and appeal dismissed as moot*, No. 94-5111, 1994 WL 517746 (D.C. Cir. Aug. 25, 1994). This Court should not be the first.

In the absence of any judicial authority, Defendants cited in their TRO briefing to two opinions of the Office of Legal Counsel. Neither opinion provides any support to Marocco's claim to authority here. The first cited opinion concerned a vacant seat on the Federal Home Loan Bank Board. *Power of the President to Designate Acting Member of the Federal Home Loan Bank Board*, 1 Op. O.L.C. 150 (1977). The opinion predated Congress's 1998 enactment of the FVRA, and it proceeded on the premise that Congress had left a gap for the Administration to fill by failing to enact a "holdover provision" for Senate-confirmed members to retain their seats pending the confirmation of a successor. *Id.* Here, of course, Congress did enact such a holdover provision, *see* 22 U.S.C. § 290h-5(a)(2), and Congress further underscored, when enacting the FVRA, that its limited statutory grant of authority for the appointment of acting officials is exclusive, leaving no gap for the Administration to fill. Moreover, this opinion was based on the premise that, without the appointment of an additional acting member, the bank board would be left with only one member, who could not by himself exercise the authority of the entire board. 1 Op. O.L.C. at 150 (citing *FTC v. Flotill Prods., Inc.*, 389 U.S. 179, 183 (1967)). This opinion could not possibly support Marocco's claim to exercise, by himself, the authority of the entire Board of USADF.

The second cited opinion is even further afield. It concerned the Presidential power of appointment of an inferior officer—the acting staff director of the Civil Rights Commission—where Congress had granted the President the authority to appoint a person permanently to that position but had not addressed his authority to

make an appointment on an acting basis. *Authority of the President to Remove the Staff Director of the Civil Rights Commission and Appoint an Acting Staff Director*, 25 Op. O.L.C. 103 (2001). The members of the Board of USADF, however, are principal officers, and Congress has expressly withheld authority from the President to appoint acting members to that body.

In short, there is no basis in law for Defendants to disregard the boundaries of Congress's limited grant of appointment authority in the FVRA. Congress took care to specify that the FVRA provides the "exclusive means" for the appointment of acting officials in the absence of Senate confirmation, 5 U.S.C. § 3347(a), and it specifically withheld the authority to appoint acting members of multi-member boards, *see Noel Canning*, 705 F.3d at 511. In the absence of a grant of authority from Congress, the President lacked the authority to appoint Marocco as an acting member of the Board of USADF. And because Marocco has not been validly appointed as an acting member of the Board, any actions he has taken or intends to take in that capacity, or as Brehm's replacement as president of USADF, must be treated as void and as without effect. *See Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 26 (D.D.C. 2022). Brehm is therefore entitled to relief precluding Marocco from exercising authority on behalf of USADF.

## B. Brehm is, at most, an inferior officer and not subject to removal by any entity other than the Board of USADF.

Because Marocco is not a member of the USADF Board, he has no power to fire Brehm. Nor do any other Defendants: The USADF President is an inferior officer and

Congress delegated the power to remove the USADF President to the USADF Board alone.

**1.** "Only the President, with the advice and consent of the Senate, can appoint noninferior officers," that is, "principal officers." *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021). In contrast, "the Appointments Clause permits Congress to dispense with joint appointment, but only for inferior officers. Congress may vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id.* at 12-13 (internal citation omitted).

"Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an 'inferior' officer depends on whether he has a superior." *Edmond*, 520 U.S. at 662. In other words, an officer of the United States is "inferior" if his "work is directed and supervised at some level by" principal officers. *Id.* at 663. The D.C. Circuit applies *Edmond* by looking to three factors: "(i) whether the officer is subject to supervision and oversight by a principal officer; (ii) whether the officer is subject to removal by a principal officer; and (iii) whether the officer has final decisionmaking authority." *Fleming v. U.S. Dep't of Agric.*, 987 F.3d 1093, 1103 (D.C. Cir. 2021); *see also Al Bahlul v. United States*, 967 F.3d 858, 871 (D.C. Cir. 2020); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339 (D.C. Cir. 2012). Removability at will is central to this analysis; if a principal officer may remove another officer at will, the provides "a powerful tool for control," suggesting that "an officer who may be

25

removed at will by another officer is the latter's 'alter ego' for constitutional purposes." *Fleming*, 987 F.3d at 1103.

The structure of the United States African Development Foundation's organic statute follows these constitutional principles to establish the Foundation's Board as its principal officer and the Foundation's President as (at most) an inferior officer.

By statute, Congress has vested the management of USADF in a board of directors, "composed of seven members appointed by the President, by and with the advice and consent of the Senate." 22 U.S.C. § 290h-5(a)(1). "The management of the Foundation" is "vested" in the Board. *Id*. The Board is accordingly the principal officer of USADF for constitutional purposes.

Each of the three *Edmond* factors here leave no doubt that the President of USADF is at most an inferior officer. At all times, he is "subject to supervision and oversight" by the principal officer of the organization, the Board. *Fleming*, 987 F.3d at 1103. He is appointed by the Board to his position as the President of the Foundation, and no provision of USADF's organic statute or any other provision of law limits the Board's authority to remove him from that position. The President of the Foundation exercises powers only "on such terms as the Board may determine." 22 U.S.C. § 290h-5(d)(1). Under this authority, the Board has delegated to the President the "responsibility for directing the day to day activities of the Foundation." 22 C.F.R. § 1501.3. And the President enjoys decisionmaking authority on behalf of the Foundation only to the extent that he is "permitted to do so by other Executive officers," *i.e.*, the Board. *Arthrex, Inc.*, 594 U.S. at 14.

26

**2.** Because the President of the Foundation is at most an inferior officer, Brehm may be removed from his position only by his principal officer, the Board, and not by the President or by any other person. Where, as here, Congress vests the appointment of an inferior officer in the head of a department, "it is ordinarily the department head, rather than the President, who enjoys the power of removal." *Free Enter. Fund v. Public Co. Accounting Bd.*, 561 U.S. 477, 493 (2010); *see also id.* at 508-09 (remedying Appointments Clause violation by leaving an inferior officer removable by a principal officer at will not by the President). That is because "removal is incident to the power of appointment." *Id.*

Congress may depart from this ordinary rule, but "[a]bsent relevant legislation," "the power to remove is held by the appointing authority, and *only by* the appointing authority." *Nat'l Treasury Emps. Union v. Reagan,* 663 F.2d 239, 247 (D.C. Cir. 1981) (emphasis added). "Thus, for example, an appointment authorized to be made by the Secretary of Defense and, in fact, made by the Secretary of Defense, cannot be revoked by the President." *Id. See also In re Hennen*, 38 U.S. (13 Pet.) 230, 260 (1839) (where Congress has vested appointment power in the head of a department, that officer holds the power of removal, and "the President has certainly no power to remove"); *The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 166 (1996) (citing *Hennen* for the proposition that "inferior officers appointed by a department head were not removable by the President (absent statutory authorization to do so) but by the secretary who appointed them" . . . "The Court's conclusions in *Hennen* . . . remain good law").

27

Marocco now asserts that he is the "Acting CEO and President," because "Mr. Brehm's claims and employment have been dealt with," Ex. B, Feleke Decl. ¶ 57, but that assertion of power is *ultra vires*. Only the Board can terminate Brehm from his position as president of the Foundation or appoint a new President. Marocco is not a member of the Board of USADF, nor may he unilaterally exercise the power of the entire Board.

### C. Brehm is the President of USADF.

Shorn of any legal authority for Marocco to act as the entire Board, and lacking the power to remove Brehm, Defendants argue that Brehm was never the President. That is wrong. Under its organic statute, the USADF Board "shall appoint a president of the Foundation." 22 U.S.C.A. § 290h-5(d)(1). On March 3, the duly appointed, bipartisan Board performed that statutory duty—it appointed Ward Brehm President and CEO. *See* Ex. H, Memorandum of USADF Board to Congress.

Defendants argue that the Board did not have the power to appoint Brehm President because the Board had been fired. In support, Defendants have offered emails purporting to deliver termination notices to each Board member. *See* Exs. 1-5 to Defs.' Mem. in Opp'n to TRO (Mar. 10, 2025), ECF No. 10-1 ("Defs.' Ex. 1-5"). But the Board never received their purported terminations.

Of the five exhibit emails, four were never delivered. For good reason: they were sent to wrong or nonexistent email addresses. The email to Chair Carol Moseley Braun (Defs.' Ex. 2) was sent to a Gmail address, but she does not have a Gmail address. Ex. B, Feleke Decl. ¶ 24. The email to Morgan Davis (Defs.' Ex. 1) was sent to two email addresses that do not exist—one at a USADF address and another at a

28

company for which he once was, but no longer is, a board member. Ex. B, Feleke Decl. ¶ 23. The email to Jack Leslie (Defs.' Ex. 3) was likewise sent to an inactive USADF address. Ex. B, Feleke Decl. ¶ 25. And worst of all, John Agwunobi's termination (Defs.' Ex. 5) was sent to an email that both misspelled his name and used usadf.org instead of the proper usadf.gov domain. Ex. B, Feleke Decl., ¶ 26.[1]

That the email termination notices were not delivered is not a surprise. When DOGE employees first demanded the contact information for the Board, a USADF staff member informed the DOGE employees that the information was personal (presumably not a .gov address) and that she would check if she could share it. Ex. B, Feleke Decl. ¶ 14. But the DOGE employees were too impatient and instead tried to find information about the Board members online. *Id.* ¶ 15. They never followed up to ask the employee if she had been given permission to share the information (which she had). *Id.* ¶ 18. Nor have Defendants shown any attempt to otherwise seek the contact information from USADF staff or management.

Because Defendants did not notify—or even make any meaningful attempt to notify—the members of the Board of a purported removal from their positions, those members retained their seats on the Board. A person may not be removed from a federal office in secret; instead, removal must actually be communicated to the officer. "[R]emoval may be made either by express notification, or simply by appointing another person to the same office." *In re Hennen*, 38 U.S. at 247 (citing *Bowerbank v.*

---

[1] Brehm does not concede that he was lawfully fired from the Board, but he recognizes that he received the termination notice and did not challenge it.

*Morris*, 3 F. Cas. 1062, 1064 (C.C.D. Pa. 1801) (No. 1726)). Both *Bowerbank* opinions endorsed the common-sense rule that notice is required to effect removal. Chief Judge Tilghman reasoned that "[a] removal from office may be either express, that is, by a notification by order of the president of the United States that an officer is removed; or implied, by the appointment of another person to the same office. But in either case, the removal is not completely effected till notice actually [is] received by the person removed." 3 F. Cas. at 1064 (Tilghman, C.J.). Judge Griffiths concurred, reasoning that "[t]here can be no question, I apprehend, but that the president may, by a proper act of office, remove a marshal, without a new appointment. But this would not supersede him until he had notice of such declaration of the president's pleasure, and only from the time of notice; the office then would be vacant." *Id.* at 1065 (Griffiths, J.); *see also Creation of the Federal Judiciary: A Review of the Debates in the Federal and States Constitutional Conventions; and Other Papers*, S. Doc. No. 75-91, at 141 n.38 (1st Sess. 1937) ("A marshal is not removed by the appointment of a new one, until he receives notice of such appointment.").

These authorities stand for the fundamental proposition that the government may not appoint or remove officers in secret. If Defendants seek to remove officers from their positions, they must communicate that fact to the officers and to the public to ensure that all may proceed with clarity as to who the actual officeholders are. Defendants never provided any notice of the Board's removal, and the Board members remained in the positions to which the Senate had confirmed them.

## II.  Brehm is entitled to relief.

### A.  Brehm is entitled to an order voiding all actions of Defendants based on Marocco's invalid claim of authority.

As an initial matter, there is no cause for this Court to weigh the usual four factors for injunctive relief in this case. Upon finding that a violation of the Federal Vacancies Reform Act has occurred, this Court's inquiry is at an end, and this Court must award relief unwinding Defendants' actions. When Congress enacted the FVRA, it explicitly removed discretion from the federal courts and mandated that relief be awarded in cases involving actions based on a putative acting officer's invalid claim of authority. 5 U.S.C. § 3348(d) provides that "[a]n action taken by any person who is not acting under section 3345, 3346, or 3347, or as provided by subsection (b), in the performance of any function or duty of a vacant office to which [section 3349c applies] shall have no force or effect," and "may not be ratified." Thus, absent an exception specified in the statute itself, "actions taken in violation of the FVRA are void *ab initio*." *SW Gen.*, 580 U.S. at 298 n.2.

In other words, "[t]he plain terms of the FVRA remove remedial discretion by directing that unlawful actions under that statute are void ab initio, thereby rendering the rules without 'force or effect' and requiring vacatur." *Asylumworks*, 590 F. Supp. 3d at 26. This Court should therefore order that all the actions taken by Defendants under Marocco's invalid claim of authority, including the purported termination of Brehm from his position as president of USADF, were invalid from the start, and must be unwound. "[A] court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland*

31

*Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is . . . for the courts to enforce them when enforcement is sought." *Id.*

### B. Brehm is entitled to injunctive relief.

In any event, even if 5 U.S.C. § 3348(d) did not control the Court's discretion here, Brehm would nonetheless be entitled to a preliminary and permanent injunction under the traditional standards for equitable relief. In addition to showing that he is likely (indeed, certain) to prevail on the merits, he has shown that he likely would suffer irreparable injury without an injunction, and that the public interest and the balance of the equities weigh in favor of awarding such relief. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted).

**1.** "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). In addressing irreparable harm, the Court assumes that the plaintiff has succeeded on the merits. *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 303.

Brehm suffers irreparable harm from the actions of the Defendants because they threaten to deprive him of his "statutory right to function" in the role that the Board of USADF has lawfully appointed him to perform. *Harris v. Bessent*, No. CV 25-412 (RC), 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025); *see also Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 212 (2020) ("a contested removal" is "certainly" a vehicle for a court to vindicate the claim of an office-holder improperly deprived of his statutory function). And any remedies at law would be inadequate to

redress this injury; Brehm does not complain here of any potential loss of pay if he were to be terminated from his position, but the lost opportunity to administer USADF in accordance with its statutory mandates, as those mandates are understood by USADF's lawful leadership, Brehm and the Board. *See Harris*, 2025 WL 679303, at *13; *see also Grundmann v. Trump*, No. CV 25-425 (SLS), 2025 WL 782665, at *17 (D.D.C. Mar. 12, 2025).

This case is therefore unlike the issue before the D.C. Circuit in the stay proceedings in *Dellinger v. Bessent*, No. 25-5052 (D.C. Cir. Mar. 10, 2025). Brehm does not complain merely of the inconvenience of "remain[ing] out of office for a short period of time." *See* Response to Defs.' Notice of Supp. Auth. (Mar. 11, 2025), ECF No. 14. If permanent injunctive relief is denied (and if no other relief is available), Brehm would never resume performing the functions that have lawfully been entrusted to him. And Defendants would then use Brehm's office to effectively shutter the agency, consistent with the plans they announced from the outset to reduce USADF to a "minimum presence and function" consisting of a board and a president who would administer only one or two privately-funded grants, Ex. B, Feleke Decl., ¶ 9, as well as their ongoing efforts to reduce IAF to the administration of only one grant that will soon expire, *see supra,* p. 14. Brehm accordingly suffers irreparable harm from "the obviously disruptive effect" that Marocco's ultra vires actions are having on the organization that Brehm is charged with managing. *Wilcox v. Trump*, No. CV 25-334 (BAH), 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025) (quoting *Berry v. Reagan*, No.

33

83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983)).

**2.** Where the Government is the opposing party, the last two factors for injunctive relief merge, because "the government's interest is the public interest." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (internal quotation marks omitted). "A party's likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest because there is generally no public interest in the perpetuation of unlawful agency action." *Id.* (internal quotation marks and alterations omitted). That substantial public interest is particularly acute here. If Defendants could disregard the restrictions on inferior officer removal, and the prohibition on the appointment of acting board officials that Congress put into place, the Appointments Clause would be rendered to be a practical nullity. *See Harris*, 2025 WL 521027, at *8.

Congress determined that USADF be run by a bipartisan, Senate-confirmed Board and a President who takes the Board's direction and answers directly to it. *See* 22 U.S.C. §§ 290h-5(a)(1), (d)(1). Both the Appointments Clause and the African Development Foundation Act specify the means for Defendants to exert influence over the Board: Presidential nomination and Senate confirmation of new Board members. Yet Defendants seek to cut the Senate out of this process in an effort to reduce USADF to a skeleton staff administering a grant or two, in complete disregard of the mission that Congress assigned to the agency to "make grants, loans, and loan guarantees to any African private or public group . . . engaged in peaceful activities,"

34

for the purpose of "the fostering of local development institutions." 22 U.S.C. § 290h-3(a)(1); *see* Ex. H, Memorandum of USADF Board to Congress. The actions of the Defendants demonstrate a disregard for the structure that Congress has put in place, and the public interest weighs heavily in favor of enforcing the Congressional design. Thus, for the same reasons that Brehm is likely to succeed on the merits, equity requires immediate relief.

Defendants argue that the new Administration has different goals in mind for USADF and that Brehm's leadership would frustrate those goals. But Defendants' plans cannot be squared with USADF's organic statute or its enacted appropriation. As discussed above, Congress instructed USADF to "carry out" the purposes of the African Development Foundation Act, 22 U.S.C. § 290h-2(b), by issuing grants to "to strengthen the bonds" between Africa and the United States by "encourag[ing] the establishment and growth of development institutions which are indigenous to particular countries in Africa." 22 U.S.C. §§ 290h-2(a), 290h-3(a). Congress has repeatedly appropriated funds to USADF to perform this statutory mission. In 2024, Congress appropriated $45 million, available through September 30, 2025, for USADF "to carry out the African Development Foundation Act" through distribution as grants. Pub. L. No. 118-47, Div. F, tit. III, 138 Stat. at 746. Congress also prohibited USADF from "implement[ing] a reorganization, redesign, or other plan" without first consulting with, and providing a detailed justification to, the appropriations committees of both Houses. *Id.* § 7063, 138 Stat. at 843-44.

USADF currently is administering 550 grants and has obligated about $13.9 million of the funds that Congress appropriated to it. Ex. B, Feleke Decl. ¶ 4. About $31.1 million remains to be obligated by USADF in fulfillment of its statutory mission between now and the end of the fiscal year. *Id*. Defendants' plan to reduce the Foundation to the administration of at most one or two privately funded grants is patently at odds with the Congressional design for the agency. *See Garland v. Cargill*, 602 U.S. 406, 427 (2024) ("Congress presumably does not enact useless laws"); *Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 877 (D.C. Cir. 2006) (Kavanaugh, J.) ("courts presume that Congress has used its scarce legislative time to enact statutes that have some legal consequence").

Moreover, their plan would leave more than $31 million of the Congressional appropriation unspent, in a manner that is inconsistent both with the African Development Foundation Act and Congress's instructions in the Further Consolidated Appropriations Act. Even if a President has "policy reasons" "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," he "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.). Instead, he "must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Id*. (citing 2 U.S.C. § 683 and *Train v. City of New York*, 420 U.S. 35 (1975)). *See also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025). And even if Defendants were to seek to reprogram funding for USADF rather than to

rescind the remaining funds entirely, they have utterly failed to meet their obligation under Section 7063 to justify their plans to Congress before attempting to do so. *See Does 1-26 v. Musk*, No. CV 25-0462-TDC, 2025 WL 840574, at \*21-22 (D. Md. Mar. 18, 2025). Defendants' plans for USADF, then, flatly disregard Congress's instructions as to the operations of the Foundation.

At bottom, Defendants' plans for USADF ignore the role of Congress: Congress enacted the statute that instructs USADF to perform its mission, Congress has continued to appropriate the funds that USADF is instructed to disburse, and the Constitution requires that the Senate participate in the selection of USADF's leadership. The public interest weighs strongly in favor of respecting Congress's role in the creation, structure, and funding of USADF.

### C. Brehm is entitled to a writ of mandamus.

Even if relief under 5 U.S.C. § 3348(d) or under the traditional standards for injunctive relief were unavailable, Brehm would be entitled to a writ of mandamus. "The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has jurisdiction over an action seeking a writ of mandamus under 28 U.S.C. § 1361 if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (internal quotation marks omitted). If jurisdiction exists, the courts also consider whether mandamus would be "appropriate under the circumstances." *See In re Al Baluchi*, 952 F.3d 363, 368 (D.C. Cir. 2020) (internal quotation marks omitted). "[M]andamus jurisdiction under § 1361 merges

with the merits." *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021) (internal quotation marks omitted).

The first two requirements for mandamus relief are easily met here. This Court "can analyze the clear right to relief and clear duty to act requirements for mandamus concurrently." *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (internal quotation marks omitted). "[T]o meet the 'clear duty to act' standard, the law must not only authorize the demanded action, but require it; the duty must be clear and indisputable." *Id.* (internal quotation marks and alterations omitted). Defendants have a clear an indisputable obligation to recognize Brehm as the lawfully appointed president of USADF, for the reasons explained above. In other words, the relevant Constitutional and statutory standards do not leave room for executive discretion— only the Board holds the authority to appoint or remove the president of USADF, and Defendants do not lawfully exercise the authority of the Board.

As to the third element of mandamus relief, as explained above, Brehm is entitled to relief under either 5 U.S.C. § 3348(d) or the traditional standards for injunctive relief were unavailable, and these are "adequate remed[ies]" that render it unnecessary for this Court to address the availability of mandamus relief. *In re Nat'l Nurses United*, 47 F.4th at 752 n.4. If these remedies were unavailable, however, then a writ of mandamus would be justified. Nor is there any reason to believe that a writ of mandamus would be inappropriate under the circumstances of this case. Given Defendants' brazen disregard of the limitations of the Appointments Clause and the FVRA, this Court should issue the writ to fulfill its duty to "vigilantly enforce federal

law" by "awarding necessary relief" through a writ of mandamus as an alternative remedy at law. *DL v. Dist. Of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (internal quotation marks omitted); *see Harris*, 2025 WL 679303, at *15.

### D. Brehm is entitled to a declaratory judgment.

Brehm is also entitled to declaratory relief. The courts generally consider "two criteria" when determining whether to issue declaratory relief: (1) whether the judgment will "clarify[] the legal relations at issue" and (2) whether it will "afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (internal quotation marks omitted). Both factors weigh in favor of declaratory relief here. There is no doubt that a judgment in Brehm's favor would settle a "substantial controversy" as to the legal relationships of the parties'—that is, whether Brehm remains the lawfully-appointed president of USADF, or whether Marocco lawfully holds that office (or any other positions with USADF). Declaratory relief would also remove the uncertainty that gives rise to these proceedings by establishing that plaintiff lawfully manages the operations of the USADF at least until such time that new Senate-confirmed Board members take their seats in conformity with the Appointments Clause.

Nor does this case present any concerns that would weigh against declaratory relief. There are no questions about the "equity" of Brehm's conduct; the "state of the record" is fully developed as to all facts relevant to the purely legal issues before this Court; the parties are plainly "adverse[]"; and there is no doubt that the "question to be decided" is one of substantial "public importance." *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012).

## CONCLUSION

For these reasons, the Court should award summary judgment in Brehm's favor. In the alternative, it should award Brehm preliminary injunctive relief until the Court can further consider the merits.

March 21, 2025                                   Respectfully submitted,

                                                  _/s/Joel McElvain_____
                                                  Joel McElvain (DC Bar No. 448431)
                                                  Bradley Girard (DC Bar No. 1033743)
                                                  Orlando Economos*
                                                  Robin F. Thurston (DC Bar No. 1531399)
                                                  Skye Perryman (DC Bar No. 984573)
                                                  Democracy Forward Foundation
                                                  P.O. Box 34553
                                                  Washington, DC 20043
                                                  (202) 448-9090
                                                  jmcelvain@democracyforward.org
                                                  bgirard@democracyforward.org
                                                  rthurston@democracyforward.org
                                                  sperryman@democracyforward.org

                                                  *motion to appear *pro hac vice* pending

                                                  *Counsel for Plaintiff*