# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ward Brehm**,<br><br>      Plaintiff,<br><br>v.<br><br>**Pete Marocco,** *et al.*,<br><br>      Defendants. | **Civil Case No. 25-cv-660** |

### DECLARATION OF ELISABETH FELEKE

I, Elisabeth Feleke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Chief Program Officer at the United States African Development Foundation (USADF).

2. I have been with USADF since October 2020. I oversee the program division within USADF, with activities in more than 20 countries in Africa.

### Background regarding USADF

3. USADF was established by Congress as a nonprofit corporation to deliver grassroots economic assistance in Africa through grants and investments in small enterprises. Through this economic assistance, USADF fulfills the Congressional purposes of promoting economic stability, reducing poverty, and mitigating conditions that fuel extremism and migration in the region.

1

4. Over the past decade, USADF has received an average annual congressional appropriation of $34.6 million, totaling $346 million. These funds have been effectively leveraged with $37 million in additional funding from African governments and private-sector partnerships. In its most recent appropriation, Congress instructed USADF to spend $45 million, available through September 30, 2025, to further its statutory mission of supporting entrepreneurship in Africa. USADF has used the appropriation to fund 550 grants that are currently in effect. To date, USADF has obligated approximately $13.9 million out of that appropriation, and approximately $31.1 million of the appropriation remains to be obligated between now and the end of the fiscal year.

5. Congress also instructed that USADF consult with the appropriations committees of both Houses before attempting to reorganize the agency, and to provide a detailed justification for any such plan. The statutory requirement for prior Congressional notification before agency reorganization, elimination, or downsizing affirms that any restructuring must align with legislative oversight.

6. By leveraging host country funding, USADF amplifies its impact without additional US taxpayer burden. In FY 2024, USADF secured matching funds from several countries, and 17% of USADF's FY 2025 operating budget is projected to come from leveraged funds.

**DOGE approaches USADF**

7. On February 20, 2025, Chris Young, a senior member of the Department of Government Efficiency (DOGE) team met with the USADF leadership team,

including me, at headquarters. Young explained that he was there to introduce DOGE to the Agency. He also announced that two software engineers would be assigned to the Agency to modernize the Agency's IT systems and create efficiencies in our operations. During discussions, I stated to Mr. Young that modernizing our IT systems and databases was welcome news and that we fully supported the mission of using technology to create a more efficient workforce. Mr. Young spoke about his experience in Africa as a child of missionaries and stated that he has seen first-hand the many problems that USADF is trying to address. He mentioned that due to the urgency of responding to the President's Executive Order aimed at USADF, the two engineers would come to the Agency the next day on February 21st.

8. On February 21, Ethan Shaotran, Jacob Altik, and Nate Cavanaugh arrived at USADF. Shaotran and Cavanaugh introduced themselves as IT personnel from GSA. Altik stated that he was a lawyer from the White House Personnel Office. They explained that we needed to immediately sign a memorandum of understanding for their detail assignment.

9. Once the MOU was signed, Altik explained the true purpose of the meeting, which was to provide USADF leadership with DOGE's interpretation of the "minimum presence and function" required by USADF's statute. DOGE read the statute to mean: 1) only the USADF Board and President/CEO are statutorily required, 2) only one or two grants funded by private sector partnerships are required, and 3) all other personnel/employees therefore needed to be eliminated under the Executive Order.

10. Altik stated that his next step was to present a RIF plan (where all USADF staff would be fired) to the board for approval by Monday, February 24. Altik threatened that if the Board didn't approve the plan, the Board would be dismissed. Both Mathieu Zahui and I tried to explain to Altik that the President's Executive Order gave the agency 14 days to respond and that we intended to comply with the order.

11. Cavanaugh and Altik then demanded immediate access to USADF systems including financial records and payment and human resources systems, which include staff job descriptions, personnel files, salaries, and organizational structure.

12. Mathieu Zahui outlined the administrative process—which includes security clearances—required to access sensitive data and personally identifiable information from the Agency's systems. He provided forms for the software engineers to complete to begin background checks.

13. Cavanaugh requested waivers on the clearance process from the USADF board. Altik demanded contact information for all board members and further stated that if the Board was unable to provide immediate clearance to access USADF systems, that he would issue a notice of dismissal to all board members the same day.

14. I informed Altik that we have only personal contact information for our USADF board members. I further stated that I would need their approval before providing personal contact information to DOGE. I began to email the board to get permission. Shaotran, Cavanaugh, and Altik seemed upset and annoyed that they

4

would have to wait for that information. Instead of waiting, they began to search Google to find contact information for the board.

15. While I was in the process of sending emails to the Board, Cavanaugh found contact information on Google for one of our board members and proceeded to call him. The board member informed Cavanaugh that he was at the airport about to catch a flight and unable to have a conversation.

16. I do not believe they found the contact information for any other members of the board.

17. I left the conference room while Shaotran, Altik, and Cavanuagh were searching for contact information on the internet and returned within a few minutes to collect the access forms they completed to start the background check required to access personally identifiable and sensitive HR information.

18. By the time I had received permission to share the contact information for the rest of the board, Shaotran, Cavanaugh, and Altik had already left USADF. They never followed up with me to ask for contact information for the other board members.

19. That same day, February 21, after learning that the DOGE team had secured the memorandum of understanding under false pretenses—stating that they would modernize our computer systems but then attempting to shut down USADF—our General Counsel withdrew the MOU.

20. On February 24, Ward Brehm informed USADF that he had received an email from Trent Morse notifying Brehm that he had been dismissed as a board

5

member of USADF. The email was very brief and did not specify any reasons for the dismissal.

21. I have since communicated with the members of the USADF board and the only board member who received a notice of termination was Ward Brehm.

22. I have reviewed the exhibits (Docket entry 10-1) that Defendants filed with their opposition to Plaintiff's Motion for a Temporary Restraining Order.

23. Exhibit 1 is an email purported to be to board member Morgan Davis. I do not recognize the email address mdavis@whitemountains.com. From his biography on the USADF website, I believe that Davis used to be a board member at White Mountains but no longer is. I do not believe that Davis ever had a USADF email address. And I am aware that mdavis@usadf.gov is not a functioning email address. Morgan Davis has confirmed with me that he does not use either of those email addresses.

24. Exhibit 2 is an email purported to be to board member Carol Moseley Braun. I do not recognize the email address carolmoseleybraun@gmail.com. Carol Moseley Braun has confirmed with me that she does not have a gmail address.

25. Exhibit 3 is an email purported to be to board member John (Jack) Leslie. I have confirmed that jleslie@usadf.gov is not a functional email address. Jack Leslie has confirmed to me that he does not use the email address jleslie@usadf.gov.

26. Exhibit 5 is an email purported to be to board member John Agwunobi. I do not believe that John Agwunobi ever had an official USADF email address. Even

6

if he did, the email address in Exhibit 5—john.agwundobi@usadf.org—both misspells his last name and is addressed to a .org domain, not a .gov domain.

27. On February 28, Mathieu Zahui shared an email that he received from Trent Morse asserting that, because USADF was "Board-less," Peter Marocco had been appointed as Acting Board Chair of USADF. After consultations with the USADF Board, Zahui responded that, because under USADF's statute, a board nomination requires Senate confirmation, USADF could not recognize Marocco's authority as USADF board chair.

## Events at the Inter-American Foundation

28. On February 21, I was informed by the CEO of Inter-American Foundation, Sara Aviel, that DOGE staff were at their headquarters the day before and that IAF provided them access to their IT systems. I related to Sara that DOGE staff came to our offices with a lawyer and threatened to cancel all our contracts and grants and dismiss our board and all staff. At the same time, Sara was waiting for DOGE staff to arrive at their offices, and she confirmed later in the evening of February 21 that DOGE threatened to dismantle IAF.

29. A few days later, I received a call from Aviel informing me that she had been dismissed as CEO of IAF. I do not believe that dismissal was legal.

30. On February 28, I heard from USADF staff that Marocco arrived at IAF with DOGE staff. The timing of his arrival, late afternoon, meant that most staff had already gone home for the day. Marocco decided to hold an impromptu Board meeting,

with himself as the sole member thus constituting a quorum. During this meeting, he appointed himself as President and CEO of IAF.

31. On Monday, March 4, Marocco announced to IAF staff that he was the new President and CEO of IAF and began the systematic dismantling of the agency by canceling all contracts and grants. He placed all IAF staff on administrative leave with the intention of implementing a reduction in force within 30 days. We were informed that IAF grantees, who mostly live in poor communities across Latin America, were told their grants were canceled. Even more troubling, they were informed they now must return any unused funds currently in their bank accounts. I fear that Marocco will do the exact same thing to USADF.

32. I have spoken with former IAF staff who have told me that not only has DOGE cancelled IAF grants and contracts, but that they have deleted the entire databases that contain the information for the grantees. USADF has similar databases for our grantees. If that information were to be deleted, it would be virtually impossible for USADF to restart its work.

33. Marocco destroyed decades of hard work at IAF within a few hours. I believe his actions will undermine our work and more importantly American interests in Africa. He will create severe hardships on those who relied on USADF funding commitments. Our grant recipients face legal and financial liabilities based on the pause or cancellation of agreements signed with USADF. Our co-funding partners, both African governments and private sector entities, are worried their financial contributions will be lost in the chaos without proper review and accountability, and

economic activities in their countries abandoned. For decades, USADF has worked to build relationships across the African continent and with our stakeholders.

### DOGE infiltrates USADF

34. On Thursday, March 6, 2025, USADF staff who were outside of the Foundation's offices saw Pete Marocco and several of his associates walk into the building that includes our offices. I confirmed with the building's security officer that they were accompanied by a person representing himself to be a U.S. Marshal, who had provided a badge and confirmed that their intentions were to access USADF offices without the approval of USADF management.

35. The U.S. Marshal told the building's property manager that he needed access to USADF's offices. The property manager, at the direction of a federal law-enforcement officer, gave Marocco and the others access to the elevator to the tenth floor. The property manager then unlocked the USADF offices for Marocco and the others to enter.

36. Power was then shut off to five floors of the building, including the floor with USADF offices. It is unclear why power was shut off and USADF was not informed by building management.

37. After one hour, USADF staff confirmed that Marocco had been seen leaving the USADF offices with two staff members from the U.S. DOGE Service. The security officer informed me they were looking to change all locks on entry doors at USADF. He stated that they seemed to be waiting for staff to arrive.

38. At about 1:31 p.m., Nate Cavanaugh sent an email to a USADF staff member who is an information technology specialist for the Foundation, and cc'd Marocco. The email stated that Marocco was "the new Acting Chairman and President of USADF." The email invited the staff member to come upstairs to get his belongings and that he could "continue to work at the office." The staff member declined the invitation.

39. Cavanaugh also sent an email on March 6 to the Department of Interior (DOI) seeking access to USADF's human-resources files, likewise asserting that Marocco was the president of the Foundation. A DOI representative then sent an email to a member of USADF's human-resources team (at 1:42 p.m.), asking USADF to complete a form to allow Cavanaugh access to USADF's human-resources files. The USADF staff member said that he had to wait for approval from Ward Brehm.

40. Around 2:00 p.m. on March 6, I received a phone call from one of USADF's staff members. He stated that he had received a phone call from a U.S. DOGE Service staff member. The DOGE representative stated that he was calling on behalf of Marocco, whom he described as the President of USADF, and demanded that the USADF staff member come to the Foundation's offices to provide access to the IT system. The USADF staff member declined to do so.

41. Representatives of the Defendants remained, unsupervised, in USADF's offices until at least 5:00 p.m. During this period, they disabled USADF's locks and keycard access to the building's elevators. Staff no longer have access to USADF's offices. As of March 19, the front door to the premises remains locked.

42. On Monday, March 10, USADF staff conducted a walk-through of the office with one of the building engineers. During the visit, staff found that the DOGE team conducted searches of individual offices, opening desk drawers, moving documents, and furniture. The targeted offices were those of the General Counsel and senior leadership of USADF.

43. Over the past 10 days, USADF has received communication from DOGE staff where Mr. Marocco is consistently referred to, by Mr. Marocco himself or by others, as USADF Board Chairman and as USADF President and CEO.

44. On March 13, the Interior Business Center (IBC) informed Chief Financial Officer, Mathieu Zahui, that on March 6, a member of DOGE staff, Nate Cavanaugh, sent a request to access USADF staff human resources files which include salary information, tenure, and personally identifiable information (PII). The request via email was copied to Mr. Marocco and Ethan Shaotran.

45. IBC further stated that on March 6, Cavanaugh had informed IBC staff that the request comes directly from Marocco and referred to Mr. Marocco as the current Chair of the USADF board.

46. IBC informed Cavanaugh that an access form must be signed by the USADF CFO, Mathieu Zahui—not the USADF president. Cavanaugh replied that USADF had a new Acting Chairman and President who was appointed by President Trump, and he is directing that access must be provided to both Cavanaugh and Shaotran.

47. IBC requested documentation of the appointment of Mr. Marocco as Acting Chairman and President of USADF. As far as I know, such documentation was never provided to IBC. IBC also sent an access request form to DOGE.

48. On March 12, IBC received the completed form signed by Mr. Marocco as "Chairman," requesting access to all HR systems for USADF. DOGE staff did not provide the purpose or reason for accessing sensitive USADF staff human resources files at the time of their request.

49. On March 13, IBC provided access to USADF human resources data to Mr. Marocco, while specifying the privacy concerns attached to these files.

50. On March 17, five USADF junior and mid-level staff members received the same email from DOGE staff member, Justin Fox, requesting access to USADF human resources data. Fox stated that he was reaching out on behalf of Mr. Marocco in his capacity as Acting President of USADF. He further stated that Marocco would like USADF staff to help with accessing USADF's grants system. Fox gave a deadline of 12:00 PM the same day for USADF to comply with his request.

51. Staff responded to Fox that they were not authorized to provide access and that a formal request should go to USADF's senior leadership. Marocco then picked up the communication by informing staff that Mr. Fox's email was a formal request and that staff were required to comply.

52. As staff reached out for assistance from senior leadership, they received a second email from Fox stating that declining to assist will be interpreted as a sign that USADF staff are no longer interested in continuing their role with the agency.

53. Alarmed with the threat of losing their jobs, staff forwarded the note to USADF General Counsel Kerline Perry and senior leadership.

54. General Counsel Perry responded on behalf of President and CEO Ward Brehm that the USADF will provide access to the information and cooperate. She requested the reasons and purpose for such a request but did not receive a response. General Counsel Perry also stated in her response that USADF was not conceding to Mr. Marocco's claim that he is the Acting President of USADF.

55. On March 18, USADF federal employees received a notice from Mr. Marocco, who identified himself as the acting chief executive officer and president of the Foundation, placing them on administrative leave. The notice further specified that staff are not permitted on USADF premises, and that they are prohibited from accessing USADF systems and attempting to use their position or authority without Mr. Marocco's permission. The notice also requested that staff provide personal contact information.

56. As of March 19, three federal employees with senior leadership positions at USADF have not received a notice of administrative leave.

57. On March 19 and after placing USADF federal employees on administrative aeave, Mr. Marocco sent an email to General Counsel Perry stating, "as Mr. Brehm's claims and employment have been dealt with, hopefully you and I can proceed without issue. I need access to review grants as Acting CEO and President."

58. On March 19, the Office of the Deputy Commissioner of the Administrative Resource Center of the Bureau of the Fiscal Service sent Mathieu Zahui an email informing him that "the current President and Chief Executive Officer of [USADF], Mr. Peter Marocco, intends to commence the termination of select USADF contracts and grants as early as today."

**Additional exhibits**

59. Attached as Exhibit D are the Amended and Restated By-Laws of USADF.

60. Attached as Exhibit E is the Memorandum of Understanding referenced in paragraphs 8 and 9 above.

61. Attached as Exhibit F is the resolution of the Board of Directors of USADF appointing Ward Brehm as the President of USADF.

62. Attached as Exhibit G is a report submitted by Mr. Brehm on behalf of USADF on March 4, 2025, to the Office of Management and Budget.

63. Attached as Exhibit H is a March 3, 2025 memorandum from the USADF Board of Directors to the House Committee on Appropriations, Subcommittee on State, Foreign Operations, and Related Programs, informing Congress that the USADF Board of Directors had appointed Ward Brehm as the president of USADF.

64. Attached as Exhibit I is an email I received from Yael Nagar, forwarding an email thread with Justin Fox and Pete Marocco in which Fox and Marocco demand access to USADF's grants system, and threaten Nagar with dismissal.


Washington, DC                                                          /s/   Elisabeth Feleke
March 21, 2025                                                              Elisabeth Feleke