IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ward Brehm**, *Plaintiff,* v. **Pete Marocco,** *et al.,* *Defendants.* | **Civil Case No. 25-cv-660** |

## UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Under Local Rule 7(h), Plaintiff Ward Brehm contends there is no genuine issue to the following facts:

1. On February 20, the day after the executive order was issued, Chris Young, a representative of the U.S. DOGE Service, met with members of the USADF leadership team. Ex. B, Feleke Decl. ¶ 7; Ex. C, Leslie Decl. ¶ 7.

2. At the meeting, Young described the intent of the U.S. DOGE Service that two engineers from the General Services Administration (GSA) would be detailed to USADF to provide software expertise to modernize architecture, system design, and improve government efficiency. Ex. B, Feleke Decl. ¶ 7.

3. That evening, Young submitted two memoranda of understanding (MOUs) for a detail assignment between GSA and USADF for Ethan Shaotran and Nate Cavanaugh which similarly described the scope of these individuals' details. Ex. B, Feleke Decl. ¶¶ 7-9; Ex. E, Memorandum of Understanding. The effective period of both detail assignments was to be from February 20, 2025, through July 4, 2026. *Id.*

4. The next day, Shaotran and Cavanaugh, accompanied by Jake Altik, a lawyer from the U.S. DOGE Service, arrived at USADF and met with USADF's leadership team. During this meeting the parties signed the MOUs that had been provided the night before. Ex. B, Feleke Decl. ¶ 8.

5. The U.S. DOGE Service team then proceeded to describe their true purpose for arriving at USADF, which was to reduce the functions of the Foundation to the "minimum presence and function" required under their reading of the African Development Foundation Act, which in their view required only that the Foundation retain its Board and President and that the agency maintain only one or two grants funded by private sector partnerships. Ex. B, Feleke Decl. ¶ 9.

6. In their view, all other personnel of the agency would be eliminated to fulfill the executive order. *Id.*

7. The U.S. DOGE Service representatives demanded immediate access to USADF systems including financial records, payment and human resources systems to include staff job descriptions, personnel files, salaries, and organizational structure. *Id.* ¶ 11.

8. The USADF management team responded by requesting an assessment of the legal basis for Altik's interpretation of USADF statutory function. USADF management further outlined the administrative process, including security clearances, that would be required to access sensitive data and personally identifiable information from the Agency's systems. *Id.* ¶ 12. USADF management further explained that any attempt to provide access outside of the clearance process would be in violation of the Privacy Act.

9. The U.S. DOGE Service representatives responded by noting that they would seek waivers to avoid the clearance process from the USADF Board. *Id.* ¶ 13.

10. Altik threatened that if the Board was unable to provide immediate clearance, they would issue a notice of dismissal to all members of the Board. *Id.*

11. The U.S. DOGE Service representatives asked for contact information for each of the members of the Board. *Id.*

12. USADF management responded that this contact information was personal and that therefore she would first need to obtain permission from the Board members to share it. Id. ¶ 14.

13. Annoyed at having to wait, the U.S. DOGE Service representatives began searching the internet for contact information. *Id.* ¶ 14.

14. They were able to find the phone number of one Board member, *id.* ¶ 15, but that Board member told them it was not possible to convene the Board on a Friday afternoon. Ex. C, Leslie Decl. ¶ 9.

15. They left before the USADF staff could provide the Board's contact information and never followed up to request it. Ex. A, Feleke Decl. ¶ 18.

16. That afternoon, USADF's management determined that the MOU had been secured under false pretenses and accordingly revoked it. *Id.* ¶ 19. So the U.S. DOGE Service representatives were no longer detailed to USADF.

17. Nevertheless, the next day (a Saturday), U.S. DOGE Service representatives again called the member of the Board with whom they had spoken the day before. Ex. C, Leslie Decl. ¶ 9.

18. They stated to this member, incorrectly, that all the other members of the Board had been terminated and asked him to implement the U.S. DOGE Service's vision of the minimum statutory functions of USADF. *Id.*

19. He declined to cooperate with the attempt to dismantle the agency. *Id.*

20. On Monday, February 24, Ward Brehm, then a member of the Board of USADF, received a notice from the Presidential Personnel Office that he had been terminated from his position on the Board. Ex. A, Brehm Decl. ¶¶ 9, 10.

21. The other Board members checked, but none had received any similar notice. Ex. C, Leslie Decl. ¶ 10.

22. Other than Brehm, every other attempted notice to terminate a member of the Board was sent to an incorrect email address. Ex. A, Feleke Decl. ¶¶ 23-26.

23. Brehm was the only Board member who received a notice of termination. Ex. A, Feleke Decl. ¶¶ 23-26.

24. Other than sending purported terminations to incorrect email addresses, Defendants did not communicate to the USADF Board that they were terminated. *See* Ex. C, Leslie Decl. ¶ 10.

25. At least one Board member thought that he might be removed in the near future, but was "at no point" under the impression that he had been removed. *Id.* ¶ 11.

26. On February 28, USADF management received a letter from the Presidential Personnel Office purporting to appoint Pete Marocco as the Acting Chair of the Board of USADF. Ex. C, Leslie Decl. ¶ 12; Ex. B, Feleke Decl. ¶ 27.

27. On March 3, after determining that the purported appointment of Marocco was illegal, Ex. B, Feleke Decl. ¶ 27, the Board met and adopted a resolution appointing Brehm as the President of USADF, in fulfillment of its statutory duty under 22 U.S.C. § 290h-5(d) to appoint that officer. United States African Development Foundation: Resolution of the Board of Directors Appointment of USADF President, 90 Fed. Reg. 11596 (Mar. 10, 2025); Ex. A, Brehm Decl. ¶ 11; Ex. C, Leslie Decl. ¶ 14.

28. On the same day, the Board transmitted a memorandum to members of Congress, alerting them to the illegal attempt to appoint Marocco to the Board, and informing Congress that Brehm was now the President of USADF. Ex. H, Memorandum from the USADF Bd. of Directors to the Subcomm. on State, Foreign Operations and Related Programs (Mar. 3, 2025).

29. On March 4, the Board held its regularly scheduled, pre-announced, and publicly accessible quarterly meeting. See United States African Development Foundation: Notice of Meeting, 90 Fed. Reg. 11037, 11037 (Mar. 3, 2025). Despite having claimed to be the only Board member, Marocco did not attend this meeting. Ex. C, Leslie Decl. ¶ 16.

30. Yet that afternoon, U.S. DOGE Service representative Nate Cavanaugh emailed USADF management to state that Marocco would arrive the next day at the offices of USADF's headquarters with software engineers who had purportedly been detailed to the Foundation. Ex. A, Brehm Decl. ¶ 12.

31. Brehm, in his capacity as President of USADF, responded that Marocco did not legally hold any position with the Foundation, and that accordingly he had instructed USADF not to permit Marocco or any other persons from outside the agency to gain access to USADF's offices. *Id.* ¶¶ 13, 17.

32. Marocco and several representatives from U.S. DOGE Service arrived at USADF's offices around mid-day on March 5, but were denied access. Ex. C, Leslie Decl. ¶ 19.

33. Marocco and his colleagues threatened to sue the building's private security guard and threatened to return with United States Marshals and Secret Service. Ex. A, Brehm Decl. ¶¶ 15-19; Ex. C, Leslie Decl. ¶¶ 18-19.

34. The next day, they did just that. Marocco and his associates, accompanied by an individual purporting to be a U.S. Marshal, gained access to

USADF's offices, and shut all USADF staff out by revoking key card access, disabling door access, and locking the front door. Ex. B, Feleke Decl. ¶¶ 34-41.

35. They rifled through staff's offices and desks, moving documents and furniture in their wake. *Id.* ¶ 42.

36. While at the USADF office, Marocco purported to hold a meeting of the Board, consisting only of himself; the minutes of that meeting recite that "Pete vote [sic] to close the meeting to the public," voted to terminate "Ward Brem" from his position as President of USADF, and voted to appoint himself in Brehm's place as acting President and CEO of the Foundation. Ex. L.

37. Since then, DOGE representatives, including Nate Cavanaugh, have continually demanded access to sensitive information systems containing human resources data for the Foundation, without regard for the legal process for gaining such access. Ex. B, Feleke Decl. ¶¶ 43-54.

38. In response to emails informing Cavanaugh that access requests must be processed by filling out a form and having it signed by the Chief Financial Officer of the Foundation, Cavanaugh said that Marocco had been appointed by President Trump as the new Acting Chairman of USADF, and that Marocco was ordering that access be granted. Id. ¶ 46.

39. Access was ultimately provided to Marocco by the Interior Business Center of the U.S. Department of the Interior on March 14. *Id.* ¶ 49.

40. On March 17, five USADF junior and mid-level staff received the same request from a new DOGE staffer—Justin Fox—and were given a deadline of the same day to reply. *Id.* ¶ 50.

41. Fox stated that he was contacting USADF on behalf of Marocco, whom he described as the President of the Foundation. *Id.* The staff informed Fox that they were not authorized to provide access, and that such requests should be directed to senior leadership. *Id.* ¶ 51.

42. Marocco intervened, stating that it was a formal request, and Fox then told them that refusal would be taken as an indication that they wished to no longer continue employment at USADF. Id. ¶¶ 51-52.

43. Afraid of losing their jobs for failing to provide access when not authorized to do so, the staff forwarded the correspondence to USADF's General Counsel. *Id.* ¶ 53.

44. The General Counsel informed Marocco and Fox that to avoid further complications, access would be granted. *Id.* ¶ 54. She asked Marocco for the purpose of such access; she received no reply. Id.

45. The next day, March 18, Marocco, again under his purported authority as Acting Chair and President of USADF, placed all USADF staff on administrative leave, specifying that they are not permitted on USADF premises, that they are prohibited from accessing USADF systems, and that they may not act without Marocco's permission. *Id.* ¶ 55.

46. As of March 19, only three federal employees at USADF, all in senior leadership positions, had not yet received notice placing them on administrative leave. *Id.* ¶ 56.

47. On March 19, Marocco emailed USADF's General Counsel stating, "as Mr. Brehm's claims and employment have been dealt with, hopefully you and I can proceed without issue. I need access to review grants as Acting CEO and President." *Id.* ¶ 57.

48. The U.S. DOGE Service has pursued a virtually identical plan to terminate USADF's sister agency, the Inter-American Foundation (IAF). On February 20, the same day that U.S. DOGE Service representatives Shaotran and Cavanaugh initially met with USADF, they also met with representatives of IAF. Decl. of Sara Aviel ¶ 7, *Aviel v. Gor*, No. 1:25-cv-00778-LLA (D.D.C. Mar. 17, 2025), ECF No. 5-2.

49. The DOGE representatives informed IAF that their plan was to reduce the functions of IAF to what they characterized as its statutory minimum operations—a board, a president, a presence in the District of Columbia, and a minimal level of contracts and grants—and sought access to IAF's systems to help them to accomplish that goal. *Id.* ¶ 9.

50. The president of IAF, Sara Aviel, declined that request. On February 26, Aviel received an email from the Presidential Personnel Office purporting to terminate her from her position. *Id.* ¶ 14.

9

51. On the evening of Friday, February 28, representatives of IAF received a communication that President Trump had exercised a purported authority to appoint Pete Marocco as the acting Chair of the Board of IAF. Ex. B, Feleke Decl. ¶ 30.

52. The communication represented that there were no other remaining members of the Board of IAF. *Id.* But the remaining members of the Board of IAF still held (and still hold) their positions. Aviel Decl., ¶ 13. The communication acknowledged that President Trump had no statutory authority under the Federal Vacancies Reform Act or the Inter-American Foundation Act to appoint acting board members but asserted that President Trump had an inherent authority to do so. Id. ¶ 15 & Ex. A.

53. That same evening, Marocco held an impromptu meeting of the IAF Board outside the IAF office because no one was there to let him in. Ex. B, Feleke Decl. ¶ 30.

54. Nate Cavanaugh and Ethan Shaotran of DOGE attended, but Marocco was the only purported Board member. He voted to close the Board meeting to the public. He then voted to appoint himself as the acting President and CEO of IAF. Aviel Decl. ¶ 16.

55. Marocco, now representing himself to be the President of IAF, instructed the Bureau of the Fiscal Service of the U.S. Department of the Treasury to terminate all but a handful of IAF's contracts. *Id.* ¶ 17.

56. On Monday, March 3, Marocco and DOGE implemented a RIF of almost all of IAF's employees. *Id.* ¶ 19. Marocco and DOGE began the process of cancelling all but one of IAF's grants and returning outside donations. *Id.* ¶ 20.

57. The sole remaining grant, in the amount of $66,000, is scheduled to expire soon. *Id.*

58. On February 24, United States Institute of Peace leadership set up a meeting with DOGE personnel, including Cavanaugh, Altik, and James Burnham, the General Counsel of DOGE, where USIP explained that it is an independent non-profit organization. Decl. of George Moose ¶¶ 5-6, *U.S. Inst. of Peace v. Jackson*, No. 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-2.

59. The DOGE team explained what they considered to be the statutory minimum function of USIP: a Board of Directors and a president, reports to Congress and the Executive branch, and expenses incident to the Board of Directors. *Id.* ¶ 7.

60. On March 8, USIP President George Moose received word that DOGE personnel were inquiring into the security operations of USIP to gain access to its offices and databases. *Id.* ¶ 8-9.

61. Moose replied that USIP is an independent non-profit entity, and that its headquarters are privately owned and its security is not handled by the federal government. *Id.* On March 14, Trent Morse of the White House Presidential Personnel Office emailed members of the USIP Board (who are statutorily protected from termination without cause) a single sentence asserting that they had been removed from the Board by President Trump without explanation or cause. *Id.* ¶ 10;

11

Decl. of George Foote ¶ 7, *U.S. Inst. of Peace v. Jackson*, 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-5.

62. The same day, DOGE personnel attempted repeatedly to enter USIP headquarters and presented USIP's General Counsel, George Foote, with a "resolution" purporting to remove Moose as president. *Id.* ¶ 9.

63. On March 16, USIP suspended its contract with its private security contractor, Inter-Con. Decl. of Colin O'Brien ¶ 4, U.*S. Inst. of Peace v. Jackson*, 1:25-cv-00804 (D.D.C. Mar. 18, 2025), ECF No. 1-8.

64. Inter-Con ID card access was revoked and all but one physical keys returned. *Id*.

65. But the next day, four Inter-Con personnel arrived at USIP headquarters with DOGE employees and used the one physical key they still had to gain access. *Id*. ¶ 5; Moose Decl. ¶ 16-17.

66. Foote informed them that they were trespassing; they ignored him and approached USIP's gun safe. Foote Decl. ¶ 18. So Foote called D.C. Metropolitan Police. *Id.* ¶ 19. When the police arrived, however, they let DOGE personnel, including into the building by picking the locks on the doors. Foote Decl. ¶ 25; O'Brien Decl. ¶ 25.

67. D.C. Police informed Foote that they believed Jackson to be the President of USIP, and escorted Foote, Moose, O'Brien, and their colleagues from the building. *Id*. ¶ 26; Moose Decl. ¶ 17-18; O'Brien Decl. ¶ 24. They have not been allowed to return. Foote Decl. ¶ 26.

68.     USADF currently is administering 550 grants and has obligated about $13.9 million of the funds that Congress appropriated to it. Ex. B, Feleke Decl. ¶ 4. About $31.1 million remains to be obligated by USADF in fulfillment of its statutory mission between now and the end of the fiscal year. *Id*.

March 21, 2025                                      Respectfully submitted,

                                                */s/Joel McElvain*
Joel McElvain (DC Bar No. 448431)
Bradley Girard (DC Bar No. 1033743)
Orlando Economos*
Robin F. Thurston (DC Bar No. 1531399)
Skye Perryman (DC Bar No. 984573)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
jmcelvain@democracyforward.org
bgirard@democracyforward.org
oeconomos@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

\* motion to appear *pro hac vice* forthcoming

*Counsel for Plaintiff*